**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JAMES VINCENT WILGUS,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE; JOSEPH R. BIDEN; ANTONY J. BLINKEN; RENA BITTER; ROGER D. CARSTENS; STEVEN GILLEN; LYNNE M. TRACY; JOHN DOES ##1-50.<br><br>Defendants. | Civil Action No. 1:24-cv-01384-JMC |

**<u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS


INTRODUCTION .......... 1

BACKGROUND .......... 4

I. U.S. Government Policy Towards "Wrongful" Detention of U.S. Nationals Abroad .......... 4

A. The Hostage Act .......... 5

B. The Levinson Act .......... 6

II. The Complaint .......... 8

STANDARD OF REVIEW .......... 10

ARGUMENT .......... 11

I. Plaintiff Lacks Standing To Bring His Claims (All Counts) .......... 11

II. The Hostage Act Is Not Applicable To This Case Because Mr. Wilgus Is Not Being Held "In Violation Of The Rights Of American Citizenship" (All Counts) .......... 14

III. Plaintiff's APA Claims (Counts 1 & 2) Should Be Dismissed .......... 15

A. Determinations Under Both The Hostage Act And The Levinson Act Are Committed To Agency Discretion As A Matter Of Law .......... 15

1. The Hostage Act .......... 18

2. Levinson Act .......... 22

B. At A Minimum, The Court Should Dismiss Count 1 Because Neither Statute Creates A "Duty of Inquiry" .......... 25

IV. The Claims Against The President Should Be Dismissed Because There Is No Cause Of Action To Sue Him (All Counts) .......... 27

V. The Mandamus and Venue Act (Count 3) And Declaratory Judgment Act (Count 4) Claims Should Be Dismissed .......... 28

A. Mandamus Is Not Available .......... 28

B. The Declaratory Judgment Act Count Must Be Dismissed .......... 29

CONCLUSION .......... 30

# TABLE OF AUTHORITIES

## Cases

*Abou-Hussein v. Mabus*,
953 F. Supp. 2d 251 (D.D.C. 2013) .......... 10

**Abu Ali v. Ashcroft*,
350 F. Supp. 2d 28 (D.D.C. 2004) .......... *passim*

*Abulhawa v. U.S. Dep't of the Treasury*,
239 F. Supp. 3d 24 (D.D.C. 2017) .......... 14

*Allen v. Wright*,
468 U.S. 737 (1984) .......... 14

*Anglers Conservation Network v. Pritzker*,
809 F.3d 664 (D.C. Cir. 2016) .......... 25

*Armstrong v. Exceptional Child Ctr., Inc.*,
135 S. Ct. 1378 (2015) .......... 27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 11

*Baker v. Carr*,
369 U.S. 186 (1962) .......... 18

*Baptist Mem'l Hosp. v. Sebelius*,
603 F.3d 57 (D.C. Cir. 2010) .......... 28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 11

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 12, 13

*Bernstein v. Kerry*,
962 F. Supp. 2d 122 (D.D.C. 2013) .......... 14

*Cardoza v. Commodity Futures Trading Comm'n*,
768 F.2d 1542 (7th Cir. 1985) .......... 3, 17

*Carney v. Adams*,
592 U.S. 53 (2020) .......... 11

*Cierco v. Mnuchin*,
857 F.3d 407 (D.C. Cir. 2017) .......... 12

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 11, 12

*Consol. Edison Co. of N.Y. v. Ashcroft*,
286 F.3d 600 (D.C. Cir. 2002) .......... 26

*Dalton v. Specter*,
511 U.S. 462 (1994) .......... 27

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) .......... 5, 6, 15

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016) .......... 16

*Dist. No. 1, Pac. Coast Dist., Marine Engineers' Beneficial Ass'n v. Mar. Admin.*,
215 F.3d 37 (D.C. Cir. 2000) .......... 16

*Doe 2 v. Trump*,
319 F. Supp. 3d 539 (D.D.C. 2018) .......... 27

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*,
485 U.S. 568 (1988) .......... 18

*Flynn v. Shultz*,
748 F.2d 1186 (7th Cir. 1984) .......... *passim*

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......... 27

*Grupo Mexicano De Desarrollo v. All. Bond Fund*,
527 U.S. 308 (1999) .......... 27

*Hawaii v. Trump*,
859 F.3d 741 (9th Cir. 2017), *vacated as moot*, 138 S. Ct. 377 (2017) .......... 27

**Heckler v. Chaney*,
470 U.S. 821 (1985) .......... *passim*

*Holtzman v. Schlesinger*,
484 F.2d 1307 (2d Cir. 1973) .......... 1, 18

*In re Cheney*,
406 F.3d 723 (D.C. Cir. 2005) (en banc) .......... 28

*Indigenous People of Biafra v. Blinken*,
639 F. Supp. 3d 79 (D.D.C. 2022) .......... 12, 14

*Int'l Refugee Assistance Project v. Trump*,
857 F.3d 554 (4th Cir. 2017) .......... 27

*Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*,
402 F.3d 1249 (D.C. Cir. 2005) .......... 10

*Jimenez v. Quarterman*,
555 U.S. 113 (2009) .......... 23

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
104 F.3d 1349 (D.C. Cir. 1997) .......... 17, 23

*Lovitky v. Trump*,
949 F.3d 753 (D.C. Cir. 2020) .......... 28

*Metz v. BAE Sys Tech. Sols. & Servs. Inc.*,
774 F.3d 18 (D.C. Cir. 2014) .......... 29

*Moghaddam v. Pompeo*,
424 F. Supp. 3d 104 (D.D.C. 2020) .......... 10, 11

**Murthy v. Missouri*,
144 S. Ct. 1972 (2024) .......... 11, 12

*N.Y. Ctr. for Foreign Policy Affairs v. U.S. Dep't of State,*
No. 1:20-cv-03847-PLF, 2024 WL 3400122 (D.D.C. July 12, 2024) .......... 14

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010) .......... 27

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) .......... 27

*Norton v. S. Utah Wilderness All.*
542 U.S. 55 (2004) .......... 26

*Oetjen v. Central Leather Co.*,
246 U.S. 297 (1918) .......... 17, 25

*Power v. Barnhart*,
292 F.3d 781 (D.C. Cir. 2002) .......... 26

*Redpath v. Kissinger*,
415 F. Supp. 566 (W.D. Tex. 1976) .......... *passim*

*Robbins v. Reagan*,
780 F.2d 37 (D.C. Cir. 1985) .......... 3, 17

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997) .......... 24

*Sierra Club v. Jackson*,
648 F.3d 848 (D.C. Cir. 2011) .......... 11

*Simon v. E. Ky. Welfare Rights Org.*,
426 U.S. 26 (1976) ........................................................................................ 11

*Smith v. Reagan*,
844 F.2d 195 (4th Cir. 1988) ........................................................................ *passim*

*Swan v. Clinton*,
100 F.3d 973 (1996) ...................................................................................... 28

*United States v. Curtiss-Wright Export Corp.*,
299 U.S. 304 (1936) ...................................................................................... 18

*Upton v. Birotte,*
No. CIV.A.11-1332, 2011 WL 2938134 (D.D.C. July 21, 2011) ................................ 29

*Wright v. Foreign Serv. Grievance Bd.*,
503 F. Supp. 2d 163 (D.D.C. 2007) ..................................................................... 0

**United States Code**

5 U.S.C. § 701 ........................................................................................ *passim*

5 U.S.C. § 706 ........................................................................................ *passim*

22 U.S.C. § 1731 ........................................................................................ 2, 5, 14

22 U.S.C. § 1732 ........................................................................................ *passim*

22 U.S.C. § 1741 ........................................................................................ *passim*

22 U.S.C. § 1741f ........................................................................................ *passim*

28 U.S.C. § 1361 ........................................................................................ 10, 28

28 U.S.C. § 2201 ........................................................................................ 10

28 U.S.C. §§ 2201–02 ........................................................................................ 28

**Regulations**

80 Fed. Reg. 37,131 (June 24, 2015) ........................................................................ 7

87 Fed. Reg. 43,389 (July 21, 2022) ........................................................................ 8, 9, 10

**Other Authorities**

Presidential Policy Directive -- Hostage Recovery Activities ("PPD-30"),
*available at* https://perma.cc/CJJ5-BZ72 ........................................................................ 7

The Plight of Americans Detained Abroad: Hearing before the House Subcomm. on Oversight and Accountability, 118th Cong. (June 13, 2024) (Statement of Assistant Secretary of State, Bureau of Consular Affairs Rena Bitter),
*available at* https://perma.cc/CH6C-GB8Z ........................................................................ 4

The Plight of Americans Detained Abroad: Hearing before the House Subcomm. on Oversight and Accountability, 118th Cong. (June 13, 2024) (statement of Roger D. Carstens) ("Carstens Statement"),
*available at* https://perma.cc/CJJ5-BZ72 .............................................................. 5, 17

U.S. Dep't of State, *About Us: Office of the Special Presidential Envoy for Hostage Affairs*, https://perma.cc/BD9E-EQWB (last accessed July 29, 2024) ............................ 4, 5, 24

U.S. Dep't of State, *Arrest or Detention of a U.S. Citizen Abroad*, https://perma.cc/HGJ4-2W6G (last accessed July 29, 2024) ............................. 1, 4, 24

U.S. Dep't of State, Resource Guide for Families of Wrongful Detainees ("RESOURCE GUIDE") 10 (2021),
*available at* https://www.state.gov/wp-content/uploads/2022/09/Guide-for-Families-of-Wrongful-Detainees-508-compliant.pdf ................................................................ 1, 22

## INTRODUCTION

Assisting U.S. citizens who are detained by a foreign government is "one of the highest priorities of the Department of State and U.S. embassies and consulates abroad." U.S. Dep't of State, *Arrest or Detention of a U.S. Citizen Abroad* ("*Arrest or Detention Advisory*"), https://perma.cc/HGJ4-2W6G (last accessed July 29, 2024). U.S. consular officers worldwide assist U.S. citizens detained by foreign governments overseas, visiting them in prison, facilitating communication to family and friends, and ensuring that prison officials are providing appropriate medical care. *Id.* Such assistance does not typically include advocacy for the release of detained individuals. But there are occasions where, in the State Department's judgment, an individual is being detained "wrongfully" such that diplomatic action to secure the individual's release is warranted. Such situations are rare, and the "discretionary determination" that a detention is "wrongful" requires "an assessment of the totality of the circumstances" by the relevant officials in the Executive Branch. U.S. Dep't of State, RESOURCE GUIDE FOR FAMILIES OF WRONGFUL DETAINEES ("RESOURCE GUIDE") 10 (2021), *available at* https://www.state.gov/wp-content/uploads/2022/09/Guide-for-Families-of-Wrongful-Detainees-508-compliant.pdf. The highly fact-specific nature of that discretionary determination—and its accompanying diplomatic and foreign policy consequences—makes the area of wrongful detention overseas particularly inappropriate for judicial oversight. "The courts, unschooled in 'the delicacies of diplomatic negotiation [and] the inevitable bargaining for the best solution of an international conflict,' must leave these sensitive determinations . . . with the political branches of our government." *Smith v. Reagan*, 844 F.2d 195, 199 (4th Cir. 1988) (internal citation omitted) (quoting *Holtzman v. Schlesinger*, 484 F.2d 1307, 1312 (2d Cir. 1973)).

This lawsuit attempts to upend the wise allocation of decision-making authority regarding wrongful detention determinations to the political branches, and would require the Secretary of State, in each of the thousands of cases in which the State Department provides assistance each year, to weigh in on whether those detentions are "wrongful." James Vincent

Wilgus ("Plaintiff") is a U.S. citizen who is currently serving out a prison sentence in Russia for indecent exposure and other crimes. Compl. ¶ 45, ECF No. 2. The State Department has continued to provide him consular assistance and support throughout his detention in Russia, as it does for all U.S. citizens detained overseas. Indeed, Plaintiff recognizes this support, noting that the former U.S. Ambassador and other State Department officials have often made the 10-hour trip from Moscow to visit him. Compl. ¶ 66. But as is true for the thousands of U.S. nationals detained overseas (including many detained in Russia), the State Department has not determined that he is "wrongfully detained." In this suit, Plaintiff argues that two federal statutes—the Robert Levinson Hostage Recovery and Hostage-Taking Accountability Act ("Levinson Act"), Pub. L. 116-220, 134 Stat. 3091 (2020), 22 U.S.C. §§ 1741–1741f (as amended), and the Hostage Act of 1868, 22 U.S.C. § 1731–32—create a legal duty for either the Secretary of State or the President to make some type of determination as to whether he is "wrongfully detained." He advances these claims under the Administrative Procedure Act ("APA"), the federal mandamus statute, and the Declaratory Judgment Act. But Plaintiff's complaint does not articulate legal claims that can survive a Rule 12 motion for numerous reasons.

As a threshold matter, Plaintiff's complaint does not properly allege a "case or controversy" under Article III of the Constitution. Plaintiff's theories of causation and redressability are all based on speculation as to how prison officials in Russia and other third-party actors would react to a determination by Defendants that he is "wrongfully detained." Those theories assume both that Defendants will conclude that Plaintiff is "wrongfully detained" and that it is beneficial to him to publicize that determination or for the Russian officials to be made aware of that determination. The absence of an imminent injury-in-fact that is traceable to Defendants conduct and redressable by this Court means there is no jurisdiction here.

Plaintiff has also failed to state a claim that Defendants have violated the Hostage Act. The Hostage Act was intended to address situations where a foreign government failed to

acknowledge the U.S. citizenship of a person in their custody. By contrast, Plaintiff's complaint alleges that not only has Russia acknowledged his U.S. citizenship, but that he was also arrested, at least in part, *because* he is a U.S. citizen. The Hostage Act simply does not apply to such situations.

Finally, as to both the Hostage Act and the Levinson Act, Plaintiff's claims under the APA, the mandamus statute, and the Declaratory Judgment Act must be dismissed. Both the Hostage Act and Levinson Act provide general guidance to the Executive Branch regarding discretionary determinations of "wrongful" or "unlawful" detention, and neither gives disappointed individuals a right to federal court oversight of State Department's handling of these complex situations. *See* 22 U.S.C. § 1741f ("Nothing in this subchapter may be construed to authorize a private right of action."). As to the APA, implementation of both statutes by the Executive Branch is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), placing them outside the purview of the judicial review provisions of § 706 of the APA. That is consistent with decades of case law that has recognized "State Department action in foreign affairs" is "unsuitable for judicial review." *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (quoting *Cardoza v. Commodity Futures Trading Comm'n*, 768 F.2d 1542, 1549 (7th Cir. 1985)). Even if the Court were to conclude that a State Department determination regarding wrongful detention (or the absence thereof) was reviewable, the Court should, at a minimum, dismiss Plaintiff's § 706(1) claim, as Plaintiff cannot establish a duty to make a "wrongful" detention determination in the case of a particular individual detained overseas. Plaintiff also fails to identify a cause of action that would give rise to declaratory or injunctive relief against the President, and neither the mandamus statute nor the Declaratory Judgment Act provide a means to obtain relief in this case.

For these reasons, and as explained in greater detail below, the Court should grant Defendants' motion and dismiss this case for lack of jurisdiction under Rule 12(b)(1), or for failure to state a claim under Rule 12(b)(6).

## BACKGROUND

### I. U.S. Government Policy Towards "Wrongful" Detention of U.S. Nationals Abroad

Thousands of Americans are detained overseas every year. The Plight of Americans Detained Abroad: Hearing before the House Subcomm. on Oversight and Accountability, 118th Cong. (June 13, 2024) (Statement of Assistant Secretary of State, Bureau of Consular Affairs Rena Bitter), *available at* https://perma.cc/CH6C-GB8Z . Assisting U.S. citizens incarcerated overseas is "one of the highest priorities of the Department of State and U.S. embassies and consulates abroad." *Arrest or Detention Advisory*.

Once notified of a detention, embassies and consulates provide assistance to support the individual during detention and ensure their safety. The range of services includes, but is not limited, to conducting in person prison visits with the U.S. citizen, contacting family members of the detained individual in line with the detainee's wishes, establishing an Overseas Citizens' Service trust so family and friends can transfer money to the detained individual, monitoring their health and welfare and ensuring prison officials provide appropriate medical care which may include nutritional supplements, and reading material. *Arrest or Detention Advisory.* These forms of support advance the State Department's commitment to "ensur[ing] fair and humane treatment for U.S. citizens imprisoned overseas." *Id.*

The State Department's commitment to assisting detained individuals does not typically encompass advocacy for their release. "Most cases of U.S. nationals arrested or detained overseas arise out of legitimate law enforcement and judicial processes," U.S. Dep't of State, *About Us: Office of the Special Presidential Envoy for Hostage Affairs* ("*SPEHA Webpage*"), https://perma.cc/BD9E-EQWB (last accessed July 29, 2024), and the State Department, as a general rule, does not "[g]et U.S. citizens out of jail," "[s]tate to a court that anyone is guilty or innocent," or "[p]rovide legal advice or represent U.S. citizens in court." *Arrest or Detention Advisory*. That being said, there are "rare instances" in which "the circumstances of the

charges or the detention may be such that the United States would regard the foreign government's ongoing incarceration of the U.S. national as 'wrongful.'" *SPEHA Webpage*. These cases require diplomatic "engage[ment] at the highest levels" and "rapid, agile, and coordinated actions to develop recovery actions and ensure all instruments of national power are drawn upon for the recovery of U.S. nationals." The Plight of Americans Detained Abroad: Hearing before the House Subcomm. on Oversight and Accountability, 118th Cong. (June 13, 2024) (statement of Roger D. Carstens) ("Carstens Statement"), *available at* https://perma.cc/CJJ5-BZ72. Congress has, from time to time, spoken to these issues, including in the two statutes invoked in this case. But as detailed below, both statutes also "indicat[e] congressional acceptance of a broad scope for executive action" in response to an unlawful or wrongful detention by a foreign government. *Dames & Moore v. Regan*, 453 U.S. 654, 677 (1981) (discussing the Hostage Act).

**A. <u>The Hostage Act</u>**

The Hostage Act, 22 U.S.C. § 1731-32, was signed into law in 1868 in response to reports of recently naturalized U.S. citizens being arrested overseas while visiting their country of origin. 40 Cong. Glob 4,331 (July 22, 1868) (noting concerns about such arrests from Irish and German communities in the United States). The drafters of the Hostage Act were concerned that certain countries were not according naturalized U.S. citizens in their custody the rights of a U.S. citizen, effectively "repatriating such citizens against their will." *Dames & Moore*, 453 U.S. at 676. The statute Congress enacted in reaction to this concern reaffirmed that "[a]ll naturalized citizens of the United States while in foreign countries are entitled to and shall receive from this Government the same protection of persons and property which is accorded to native-born citizens." 22 U.S.C. § 1731. It also provided the following guidance to the President:

> Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be

> wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war and not otherwise prohibited by law, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.

22 U.S.C. § 1732. This language "indicates congressional willingness that the President have broad discretion when responding to the hostile acts of foreign sovereigns." *Dames & Moore*, 453 U.S. at 677; *see also id.* at 677-78 (discussing statements of the Hostage Act's drafters and proponents).

A close analysis of the statute's text confirms that it is "run through with discretion." *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 66 (D.D.C. 2004) (finding Hostage Act did not create a duty on the part of the President to act that could be enforced through a mandamus action). The President's "duty . . . to demand" the basis for imprisonment is contingent on it being "made known" to him, through unspecified processes, that an individual has been "unjustly deprived" of his liberty, a phrase the statute does not define. 22 U.S.C. §1732. The President is only obligated to "demand the release of such citizen" if "it appears to be wrongful and in violation of the rights of American citizenship," concepts which are also not defined by the statute. *Id.* The President "shall use means . . . as *he* may think necessary and proper to obtain or effectuate release" of the individual. *Id.* (emphasis added). And the President is to report to Congress on "the facts and proceedings relative thereto . . .as soon as practicable," without a firm timeline. *Id.* No surprise, then, that another judge of this Court concluded that the Hostage Act did not "clearly and indisputably compel[]" the federal government to make specific inquiries or take certain actions on behalf of individuals detained overseas. *Abu Ali*, 350 F. Supp. 2d at 67.

**B. <u>The Levinson Act</u>**

The State Department's present-day framework for addressing wrongful detention has its origins in Executive Order 13698, 80 Fed. Reg. 37,131 (June 24, 2015), and "Presidential

Policy Directive -- Hostage Recovery Activities" ("PPD-30"), *available at* https://perma.cc/4MNT-4M6P. PPD-30 outlines the policy of the federal government towards hostage taking (*i.e.*, detention by non-state actors such as terrorist organizations), as well as steps for the government to take to prevent the taking of hostages and prepare for such incidents should they come to pass. EO 13698 creates an infrastructure within the Executive Branch which coordinates the federal government's response to hostage taking. That infrastructure includes, as relevant here, a Special Presidential Envoy for Hostage Affairs ("Special Envoy") within the State Department. In addition to the Special Envoy's responsibilities over hostage taking situations, EO 13698 charges the Special Envoy with coordinating interagency and diplomatic efforts in situations where a foreign government confirms that it has detained a U.S. national, and the U.S. regards such detention as "unlawful" or "wrongful." 87 Fed. Reg. 37,131, 37,133, § 4(b)(v).

Congress subsequently enshrined the wrongful detention infrastructure created by EO 13698, including the role of the Special Envoy, in the Levinson Act, 22 U.S.C. §§ 1741–1741f, which was enacted in 2020 and amended in 2022 and 2023. Section 1741(a) of the Levinson Act, entitled "Review," states that "[t]he Secretary of State shall review, as expeditiously as possible, the cases of United States nationals detained abroad to determine if there is credible information that they are being detained unlawfully or wrongfully." 22 U.S.C. § 1741(a). That determination is "based on criteria which may include" a list of eleven factors denominated by Congress. *Id.* § 1741(a)(1)–(11). If the Secretary does determine, "based on the totality of the circumstances, that there is credible information that the detention of a United States national abroad is unlawful or wrongful," the Levinson Act directs the Secretary to "transfer responsibility for such case from the Bureau of Consular Affairs" to the Special Envoy, and provide notification to the relevant oversight committees for foreign relations and intelligence in Congress within fourteen days. *Id.* § 1741(b)(1)(A)–(B). The Act further directs the Secretary to provide a written report to Congress annually about individuals for whom the Secretary has determined credible information of unlawful or wrongful detention exists. *Id.* §

1741(c). The statute also provides for the possibility of other services to wrongfully detained U.S. nationals and their families. *Id.* § 1741(d). Finally, Congress instructed that "[n]othing in this subchapter may be construed to authorize a private right of action." 22 U.S.C. § 1741f.

In 2022, President Biden issued Executive Order 14078, 87 Fed. Reg. 43,389 (July 21, 2022), to "reinforce the roles, responsibilities, and commitments" in EO 13,698 and PPD-30, and to "ensure that . . . interagency coordination, family engagement, and diplomatic tools are enshrined in United States Government efforts to secure the safe release and return of United States nationals wrongfully detained by foreign state actors." 87 Fed. Reg. at 43,389.

## II. <u>The Complaint</u>

Plaintiff is a U.S. citizen who has been detained in Russia since November 7, 2016. Compl. ¶ 6, ECF No. 2. As relevant to this motion, the gravamen of Plaintiff's complaint is that despite the supposed existence of "a great deal of 'credible information that [he is] being detained unlawfully or wrongfully,'" *id.* ¶¶ 42–62 (summarizing the basis for Plaintiff's position that he is wrongfully detained), Plaintiff alleges that Defendants have not taken actions that Plaintiff believes are required by the Hostage Act and the Levinson Act, even though Defendants have taken those actions with respect to other United States nationals detained in Russia. With respect to the Hostage Act, Plaintiff alleges that Defendants have "fail[ed] to undertake a meaningful inquiry into the circumstances of Plaintiff's detention in Russia, to demand his release, to use all necessary and proper means to effectuate his release, and to communicate to Congress about his case ." *Id.* ¶ 22. As for the Levinson Act, Plaintiff alleges that Defendants "have violated their obligations to Plaintiff . . . by refusing to make the initial Levinson Act [d]etermination in his case . . . and they have accordingly unlawfully shielded themselves from the numerous other obligations imposed by subsequent sections of the Act which are triggered only once that [d]etermination is made." *Id.* ¶ 30.

Plaintiff alleges that Defendants' failure to make this determination is compounded by the Federal Government's decision to make a Levinson Act determination of wrongful

detention for other Americans detained in Russia, including Brittney Griner, Trevor Reed, Paul Whelan,[1] and Evan Gershkovich. *Id.* ¶¶ 34–41. Plaintiff's complaint also alleges that there are "dozens" of individuals who he believes are wrongfully detained abroad but for whom Defendants have not made this determination, including at least one of Plaintiff's fellow prisoners in Russia, Thomas Stwalley. *Id.* ¶ 2.

Plaintiff's complaint concedes that the relief he is seeking "is no guarantee that he will be released and brought home." *Id.* ¶ 63. But Plaintiff contends that there are "numerous ways in which their delay in making a Levinson Act [d]etermination has caused concrete injury to Plaintiff." *Id.* ¶ 64. Plaintiff alleges that he and Mr. Stwalley are treated less favorably both by Defendants and by Russian prison officials than Mr. Whelan, whom Defendants have deemed to be "wrongfully detained." *Id.* ¶ 65. For example, Plaintiff alleges, the U.S. Ambassador to Russia visited Mr. Whelan when visiting Plaintiff's prison last year, but did not visit with Plaintiff or Mr. Stwalley. Plaintiff alleges the State Department informed him it is against "policy" for the Ambassador to visit those who have not been determined as wrongfully detained, but also acknowledges that, despite Plaintiff's claims of being informed of this "policy", the former Ambassador has visited him at least once in the past. *Id.* ¶ 66. Plaintiff further alleges that this differential treatment "has signaled to the Russian prison authorities and other inmates that Plaintiff is not important to the United States," which means he is "subjected to even more punitive treatment and conditions" than Mr. Whelan. *Id.* ¶ 67. Plaintiff also believes that "most of the private organizations that support wrongfully detained Americans will not assist him or his family" because of the State Department's failure to make the necessary determination under the Levinson Act. *Id.* ¶ 68.

Plaintiff's complaint pleads four counts. Count one alleges that Defendants have unlawfully withheld or delayed a determination of Plaintiff's wrongful detention status, pursuant to 5 U.S.C. § 706(1). *Id.* ¶¶ 72–77. Count two asserts that "Defendants' failure to

---

[1] The U.S. Government began demanding Mr. Whelan's release in 2018, before the passage of the Levinson Act.

take the actions required under the Hostage Act and the Levinson Act with regard to Plaintiff," even as they "act[] quickly in the cases of other Americans detained in Russia," is arbitrary, capricious, and an abuse of discretion under 5 U.S.C. § 706(2)(A). *Id.* ¶¶ 78–80. Count three is a mandamus claim under 28 U.S.C. § 1361, in which Plaintiff asserts that Defendants "are required under the Hostage Act and the Levinson Act to review the cases of all U.S. nationals detained abroad, to demand the release of any wrongfully or unlawfully detained, and to report to Congress regarding their efforts." *Id.* ¶¶ 81–87. Count four is a declaratory judgment action pursuant to 28 U.S.C. § 2201(a), on substantially the same theories noted above. *Id.* ¶¶ 88–92. In terms of relief, Plaintiff seeks a declaration that Defendants have failed to comply with the Hostage Act and Levinson Act, and to "[c]ompel[] Defendants to perform their legal duties under the Hostage Act and the Levinson Act, and to make a determination forthwith as to whether 'there is credible information that [Plaintiff is] being detained unlawfully or wrongfully.'" Compl. ¶¶ a–c (prayer for relief).

## STANDARD OF REVIEW

A Rule 12(b)(1) motion tests this Court's subject-matter jurisdiction. "In reviewing a motion to dismiss pursuant to Rule 12(b)(1), courts must accept as true all factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be drawn from the facts alleged." *Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 111 (D.D.C. 2020). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), [a] plaintiff['s] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Id.* (quoting *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007)). "Finally, in determining whether it has jurisdiction, the Court 'may consider materials outside of the pleadings."' *Abou-Hussein v. Mabus*, 953 F. Supp. 2d 251, 257 (D.D.C. 2013) (quoting *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)). "Despite the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the

plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence." *Moghaddam*, 424 F. Supp. 3d at 111.

Dismissal under Rule 12(b)(6) is appropriate if, assuming the truth of all well-pled factual allegations, Plaintiffs have failed to state a claim upon which relief can be granted. To pass muster, a complaint must contain "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" warrants dismissal. *Id.* (quoting *Twombly*, 550 U.S. at 557). Although a court must accept well-pleaded factual allegations as true and construe them in the light most favorable to the plaintiff, it need not accept "legal conclusions" or "mere conclusory statements." *Id.* "[A] complaint seeking review of agency action 'committed to agency discretion by law,' 5 U.S.C. § 701(a)(2), has failed to state a claim under the APA, and therefore should be dismissed under Rule 12(b)(6), not under the jurisdictional provision of Rule 12(b)(1)." *Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011). As explained below, Plaintiff's complaint fails to state proper claims under the APA.

## ARGUMENT

### I. Plaintiff Lacks Standing To Bring His Claims (All Counts)

In order to demonstrate standing, Plaintiff must show he "has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). "The plaintiff 'bears the burden of establishing standing as of the time [he] brought th[e] lawsuit and maintaining it thereafter.'" *Id.* (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)). That burden is challenging to meet when standing depends upon "the independent action of some third party not before the court, *id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)), "particularly when the independent actors are foreign sovereigns over whom the Court exercises no authority," *Indigenous People of Biafra v. Blinken*, 639 F. Supp. 3d 79, 87

(D.D.C. 2022) (Cobb, J.). *See also Cierco v. Mnuchin*, 857 F.3d 407, 419 (D.C. Cir. 2017) ("We have been particularly reluctant to find standing where the third party upon whose conduct redressability depends is a foreign sovereign."). "Rather than guesswork, the plaintiffs must show that [third parties] 'will likely react in predictable ways' to the defendants' conduct." *Murthy*, 2024 WL 3165801, at *7 (quoting *Department of Commerce v. New York*, 588 U.S.752, 768 (2000)). That showing is met when the plaintiff can demonstrate that the defendant's action has a "determinative or coercive effect upon someone else" that results in an injury to the plaintiff. *Bennett v. Spear*, 520 U.S. 154, 169 (1997).

Plaintiff appears to allege three potential sources of Article III injury. First, although he acknowledges that the relief he seeks would not guarantee his release from prison, he suggests that the absence of a determination by the Defendants that he is wrongfully detained decreases the chances that he will be released from prison. Compl. ¶¶ 63-64. Second, Plaintiff asserts that the absence of a State Department determination that he is "wrongfully detained" has "signaled to the Russian prison authorities and other inmates that Plaintiff is not important to the United States," resulting in Plaintiff being subject to harsher treatment from Russian authorities than would otherwise be the case. *Id.* ¶¶ 65–67. Third, Plaintiff speculates that private organizations that support wrongfully detained individuals are less willing to help him because the Defendants have not determined Plaintiff is "wrongfully detained." *Id.* ¶ 68. But none of these alleged injuries suffices for standing purposes because they are not traceable to Defendants' actions and redressable by the Court, for several reasons.

To begin within, each of these theories assumes that Defendants would conclude that there is credible information Plaintiff is being wrongfully detained if the Court rules in Plaintiff's favor in this case. But that is by no means guaranteed, in particular because any determination is discretionary and based on the totality of the circumstances. Plaintiff assumes that Defendants will agree he is "wrongfully detained" if they undertake their alleged legal duty, *see, e.g.*, Compl. ¶¶ 42, 46, but no form of relief requested in the complaint would actually compel Defendants to conclude Plaintiff is "wrongfully detained." Even Plaintiff's

§ 706(2)(A) claim (count two) is limited to analyzing the fact that decisions were made as to certain individuals, but not as to him; it does not explicitly contend that Defendants should reach a particular conclusion as to Plaintiff. As such, all of Plaintiff's theories are founded on speculation and a desire to direct the outcome of a discretionary decision-making process that provides no guaranteed outcomes.

Even if Plaintiff could establish that the Defendants would exercise their discretion in his favor, he cannot show that the third parties on whom his theory of causation depends would treat him more favorably if Defendants were to make the determination Plaintiff desires. There is simply no way of knowing from the complaint if officials in a remote Russian prison camp would treat Plaintiff better, let alone release him, if the Court were to order Plaintiff's requested relief. Plaintiff concedes, for instance, that he has previously been visited by the U.S. Ambassador, and that visit does not appear to have materially changed his circumstances. Compl. ¶ 66 n.32. Although Plaintiff compares his situation to that of Mr. Whelan, they are not alike in all material respects: Mr. Whelan was arrested and convicted in Russia for a different crime (espionage) than Plaintiff (indecent exposure, among other things). *Id.* ¶¶ 40, 45. Moreover, the government has been working to secure Mr. Whelan's release for the last 6 years, including before and after the passage of the Levinson Act, so it is not clear that any determination by Defendants under the Levinson Act today would influence Russian authorities. *Id.* ¶¶ 37, 39. The same basic issue applies to Plaintiff's allegations about "private organizations": it is purely speculative that a determination by Defendants as to whether Plaintiff is wrongfully detained would have a determinative effect on whether those independent organizations decide to commit resources to help him. *See Bennett*, 520 U.S. at 169.

The judges of this Court have been reluctant to conclude an Article III case or controversy exists when the plaintiffs' theories of injury rest on speculation about how overseas actors such as foreign governments will react in response to a decision by the U.S.

government,[2] let alone regarding those held in a foreign territory who have been convicted of a crime. This case is no different. Plaintiff fails to plead sufficient facts to show, without speculation, that a determination whether Plaintiff has been wrongfully detained would result in his release, an improvement in the conditions of his confinement, or greater attention from independent organizations. As such, he lacks standing, and the complaint should be dismissed pursuant to Rule 12(b)(1).

## II. <u>The Hostage Act Is Not Applicable To This Case Because Mr. Wilgus Is Not Being Held "In Violation Of The Rights Of American Citizenship" (All Counts)</u>

Plaintiff also fails to state a claim under the Hostage Act because the statute does not apply to him. The Hostage Act was passed to address the issue of Americans being detained abroad in ways that ignored or denied their status as Americans. That is the basis for the statute's reference, in § 1731, to reaffirming the equal rights of naturalized U.S. citizens, and, in § 1732, to detentions that are both "wrongful *and* in violation of the rights of American citizenship." 22 U.S.C. § 1732 (emphasis added). In *Dames & Moore*, the Supreme Court relied

---

[2] *See, e.g.*, *N.Y. Ctr. for Foreign Policy Affairs v. U.S. Dep't of State*, No. 1:20-cv-03847-PLF, 2024 WL 3400122, at *5–7 (D.D.C. July 12, 2024) (concluding that plaintiff's lacked standing to challenge the authorization of a weapons sale to the United Arab Emirates based on prior attacks by the UAE on refugee detention centers in which the plaintiff provided humanitarian aid); *Indigenous People of Biafra*, 639 F. Supp. at 85–87 (the Secretary of State's decision to sell military aircraft to the Nigerian government lacked standing because their argument that the Nigerian government would then use the aircraft against Biafrans in Nigeria required the court to speculate about the resulting actions by the Nigerian government, the actual party alleged to cause the future harm); *Abulhawa v. U.S. Dep't of the Treasury*, 239 F. Supp. 3d 24, 34 (D.D.C. 2017) (concluding that plaintiffs challenging the Treasury Department's decision to grant tax-exempt status to pro-Israeli settlement organizations lacked standing because plaintiffs' argument that the settlement organizations' alleged criminal activity would not have occurred but for their tax exempt status was "attenuated" and relied upon "speculative inferences about the independent actions of some third parties not before the Court" (quoting *Allen v. Wright*, 468 U.S. 737, 757, 759 (1984))); *Bernstein v. Kerry*, 962 F. Supp. 2d 122 (D.D.C. 2013) (no standing for claims by U.S. citizens injured in terrorist attacks in Israel that State Department's alleged failure to properly certify assistance to the Palestinian Authority and non-governmental organizations in the West Bank and Gaza resulted in aid being directed to the groups carrying out the attacks).

on this language to conclude that the Hostage Act did not authorize the suspension of claims in civil courts related to the Iranian hostage crisis. That was so because, "[a]lthough the Iranian hostage-taking violated international law and common decency, the hostages were not seized out of any refusal to recognize their American citizenship—they were seized precisely *because* of their American citizenship." 453 U.S. at 676–77.

Similarly, the facts pled in Plaintiff's complaint, even when read in the light most favorable to him, do not suggest that his status as an U.S. citizen is being ignored or denied by officials in Russia. He himself alleges, in connection with his Levinson Act claim, that he meets the criteria in § 1741(a)(2) that his detention is "solely or substantially because he or she is a United States national." Compl. ¶¶ 46–49. He also acknowledges that he has received visits while in prison from officials connected with the U.S. Embassy in Russia, including, on at least one occasion, the prior U.S. Ambassador to the Russian Federation. *Id.* ¶ 66. That would not be the case if Russian officials were ignoring or denying Plaintiff the rights attendant to his U.S. citizenship. The Hostage Act simply does not speak to the specific circumstances of Plaintiff's detention. As such, his Hostage Act claims must be dismissed.

## III. Plaintiff's APA Claims (Counts 1 & 2) Should Be Dismissed

Plaintiff's APA claims should be dismissed for two reasons. First, because the complaint seeks review of an alleged failure to take actions that are committed to agency discretion as a matter of law, the review provisions of the APA do not apply to this case, precluding Plaintiff's claims under both § 706(1) and § 706(2)(A). *See* 5 U.S.C. § 701(a)(2). Second, even if Defendants' actions were reviewable by this Court under the APA, neither the Levinson Act nor the Hostage Act, properly construed, gives rise to a "duty of inquiry," which requires dismissal of Plaintiff's claim arising under § 706(1).

### A. Determinations Under Both The Hostage Act And The Levinson Act Are Committed To Agency Discretion As A Matter Of Law

The APA does not permit judicial review of agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "[E]ven where Congress has not affirmatively

precluded [judicial] review" of agency action, such review is not permitted "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Concerns about the absence of meaningful standards of review are particularly acute "in the realm of foreign affairs and national interest," because those areas "are not subjects fit for judicial involvement." *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85 (D.D.C. 2016) (quoting *Dist. No. 1, Pac. Coast Dist., Marine Engineers' Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 42 (D.C. Cir. 2000)).

The leading decision on § 701(a)(2) is *Heckler*, and it is particularly instructive here. In that case, a group of prisoners sued the Food and Drug Administration ("FDA") for refusing to institute investigative and enforcement proceedings against states seeking to administer lethal injection to carry out capital punishment. 470 U.S. at 823–25. The challengers asserted that "FDA was required to approve the drugs as 'safe and effective' for human execution before they could be distributed in interstate commerce." *Id.* at 824. The Supreme Court framed the question before it as "the extent to which determinations by the FDA *not to exercise* its enforcement authority over the use of drugs in interstate commerce may be judicially reviewed." *Id.* at 828 (emphasis added). It concluded that "[r]efusals to take enforcement steps" were, indeed, presumptively unsuitable for judicial review, for several reasons. *Id.* at 831–32. First, such decisions "often involve[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* That includes assessment of "whether a violation has occurred," the availability of resources to pursue the violation, the likelihood of success of the enforcement action, and the fit between the action and the agency's overall policies. *Id.* at 831. Agencies are "far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 832. Second, refusals generally do not implicate "exercise of [the federal government's] *coercive* power over an individual's liberty or property rights, and thus do not infringe upon areas that courts often are called upon to protect." *Id.* Finally, refusals share the characteristics of decisions to

decline prosecution, "long . . . regarded as the special province of the Executive Branch." *Id.*

Plaintiff's challenge to Defendants' alleged refusal to determine whether he was "wrongfully detained," under either the Levinson Act or Hostage Act, is analogous to the decision challenged in *Heckler*, and merits a presumption of unreviewability. Courts in this Circuit have long "been wary of second-guessing executive branch decision[s] involving complicated foreign policy matters." *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State* ("*Asylym Seekers*"), 104 F.3d 1349, 1353 (D.C. Cir. 1997). Indeed, *Heckler* merely "added to the list of agency actions unsuitable for judicial review, such as State Department action in foreign affairs . . . the class of agency nonenforcement decisions." *Robbins*, 780 F.2d at 45 (quoting *Cardoza*, 768 F.2d at 1549). That is because such decisions often share the characteristics of other actions committed to agency discretion by law.

Those shared characteristics are especially striking here. "Every case" of a U.S. national detained overseas "is unique," requiring the State Department "to take a hard look at the facts" surrounding the detention. Carstens Statement. Consistent with the Levinson Act, the State Department looks to the "totality of the circumstances," 22 U.S.C. § 1741(b)(1), which may vary dramatically from case to case and include wide-ranging foreign policy considerations. The Executive Branch, and in particular the State Department, is uniquely suited to assess the conditions under which U.S. nationals are detained overseas, the degree to which different forms of intervention are both appropriate and likely to help the individual in custody, and the critical foreign policy and diplomatic impact of such a determination. These determinations do not involve the exercise of coercive power over anyone; rather, they regulate how the Executive Branch deploys its own resources in assisting Americans imprisoned overseas. And just as the exercise of prosecutorial discretion is a "special province of the Executive Branch," so too is the exercise of diplomatic judgment and discretion in the assessment of the cases of Americans imprisoned overseas. *Heckler*, 470 U.S. at 832; *see Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the

political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."); *Smith*, 844 F.2d at 199 (recognizing courts are "unschooled in 'the delicacies of diplomatic negotiation [and] the inevitable bargaining for the best solution of an international conflict'" (quoting *Holtzman*, 484 F.2d at 1312 (2d Cir. 1973))). Indeed, it is the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations" to decide the "important complicated, delicate and manifold problems" of foreign relations. *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319, 320 (1936).

Interpreting either statute Plaintiff invokes to create a statutory obligation on the State Department to commit certain actions in this sensitive field of diplomatic relations, reviewable by the judiciary, would itself raise serious potential constitutional concerns that this Court should avoid. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("beyond debate" that courts should avoid a statutory construction that "would raise serious constitutional problems"). A review of the statutes under which Plaintiff sues confirms that Congress did not create such a scheme, because both statutes involve determinations that are committed to agency discretion by law.

### 1. <u>The Hostage Act</u>

To the Government's knowledge, the application of § 701(a)(2) to the Hostage Act is a question of first impression. Previous decisions, such as *Flynn v. Shultz*, 748 F.2d 1186 (7th Cir. 1984); *Redpath v. Kissinger*, 415 F. Supp. 566 (W.D. Tex. 1976); and *Smith*, have principally analyzed the Hostage Act under the "political question" doctrine articulated in cases like *Baker v. Carr*, 369 U.S. 186 (1962); the most recent decision, *Abu Ali*, did not. To be clear, the Court need not reach these issues with respect to the Hostage Act. As explained above, the Hostage Act does not apply to the circumstances of Plaintiff's detention, as his complaint makes clear that Russia does not deny his U.S. citizenship. Nonetheless, should it reach this issue, the Court should hold that decisions to inquire (or not inquire) under the Hostage Act are "committed to agency discretion by law" and not subject to judicial review

under the APA.

As another judge of this Court noted, the Hostage Act "is run through with discretion, starting at the very outset with the 'unjustly deprived' determination on which all of the other provisions are conditioned." *Abu Ali*, 350 F. Supp. 2d at 66. In the handful of cases seeking to compel government action under the Hostage Act (all of which were brought in a mandamus posture), courts have largely agreed with this assessment and denied relief to plaintiffs dissatisfied with the President's response to the detention of U.S. citizens overseas. In *Abu Ali*, this Court refused a plaintiff's claim for mandamus relief based on allegations that the Hostage Act "gives rise to a mandatory duty on the part of the President to demand the Saudi Government to release" the plaintiff. *Id.* at 65–67. In *Smith*, the Fourth Circuit dismissed another mandamus action against the President on political question doctrine grounds, emphasizing the commitment of questions regarding the detention of Americans overseas to the political branches, the lack of judicially manageable standards for resolving disputes arising under the Hostage Act, and the likely inability of the Court to provide a meaningful remedy. *Smith*, 844 F.2d at 198–200. And in both *Flynn v. Shultz*, 748 F.2d 1186 (7th Cir. 1984), and *Redpath v. Kissinger*, 415 F. Supp. 566 (W.D. Tex. 1976), courts rejected the efforts of Plaintiffs to seek to compel any specific actions on the part of the federal government on behalf of the prisoner. *Flynn*, 748 F.2d at 1193–94 ("[R]eview of the substance of the inquiry [into the prisoner's detention] and subsequent decision clearly presents a nonjusticiable political question"); *Redpath*, 415 F. Supp. at 568 ("The official actions sought are not ministerial, but are clearly of a diplomatic nature involving the exercise of discretion by the Executive, or under his direction").

The few courts to address the Hostage Act have been split on the question of whether it creates "a duty of inquiry and report on the part of the President with respect to [the] preliminary determination" of "the President that a citizen has been unjustly deprived by his liberty by a foreign government." *Flynn*, 748 F.2d at 1193 (cleaned up); *Redpath*, 415 F. Supp. at 568. In *Smith*, the Fourth Circuit acknowledged these holdings, but did not address the

"duty of inquiry" issue because the plaintiffs did not "allege that the President has failed to look into allegations that American servicemen remain captive in southeast Asia." *Smith*, 844 F.2d at 199. Upon reviewing *Smith*, *Flynn*, and *Redpath*, the *Abu Ali* court explicitly rejected the existence of a "duty of inquiry" under the Hostage Act as "a misreading of the statute," concluding that "[t]here is no basis for the Court to issue a writ of mandamus for any duty that is conditioned on [a] determination [that an individual has been unjustly deprived of his liberty], including the duty of inquiry." *Abu Ali*, 350 F. Supp. 2d at 66 n.37.

This Court should hold that all agency action under the Hostage Act—including questions as to whether Defendants have satisfied some "duty of inquiry"—is unreviewable under § 701(a)(2). This is manifest from the text of the statute. All of the actions described in § 1732 are contingent on discretionary determinations by the President that the court lacks a manageable standard to review:

| Language of § 1732 | Discretionary or Contingent Features of Language |
|---|---|
| Whenever *it is made known* to the President that any citizen of the United States has been *unjustly deprived of his liberty* by or under the authority of any foreign government, it shall be the duty of the President *forthwith* to demand of that government the reasons of such imprisonment; | • No definition or procedure for how incidents are to be "made known" to President.<br>• No definition of "unjustly deprived of his liberty."<br>• No definition of "forthwith." |
| and if it *appears to be wrongful and in violation of the rights of American citizenship*, the President shall *forthwith* demand the release of such citizen, | • Defers to President as to the "appear[ance]" of the imprisonment<br>• No definition of "wrongful" or "in violation of the rights of American citizenship."<br>• No definition of "forthwith." |
| and if the release so demanded is *unreasonably delayed or refused*, the President shall use such *means*, not amounting to acts of war and not otherwise prohibited by law, *as he may think necessary and proper to obtain or effectuate the release*; | • No definition of "unreasonably delayed or refused."<br>• Defers to President as to which "means" are "necessary and proper to obtain or effectuate the release" |
| and all the facts and proceedings relative thereto shall *as soon as practicable* be | • No definition of "as soon as practicable" |

| | |
|---|---|
| communicated by the President to Congress. | • Contingent on prior clauses of statute |

Plaintiff's complaint narrowly focuses on the "duty of inquiry" described by cases like *Flynn* and *Redpath*, and seeks APA review on the basis of (1) the alleged absence of a "determination" in Plaintiff's case, and (2) the arbitrariness of Defendants' decision to allegedly "neglect[] to act on Plaintiff's behalf while at the same time acting quickly in the cases of other Americans detained in Russia." Compl. ¶¶ 21–22, 74, 80. The Court should reject those arguments. The only investigative "duty" the statute speaks of—to "forthwith . . . demand of [the foreign] government the reasons of such imprisonment"—is contingent on it being "made known" to the President that the prisoner "has been unjustly deprived of his liberty." The statute prescribes no guidelines for what "unjustly deprived of his liberty" means, no process for how these issues are to be "made known" to the President, and no standards by which this Court could review such a process, much less its outcome. The *Flynn* court itself acknowledged that "any duty under § 1732 is contingent upon the preliminary determination of 'unjustly deprived' [] since this Court cannot make that determination itself." 748 F.2d at 1194. *Flynn* also fails to explain what, precisely, a "meaningful" inquiry would entail, which is yet another reason why this Court should not rely upon it. APA review of such a question would inevitably devolve into the substance of the Executive Branch's considerations with respect to each situation, with no guidance from Congress as to what sort of review is required. That being the case, the Court lacks the ability to review a decision (or the absence of a decision) purportedly called for by the Hostage Act.

At times, Plaintiff's complaint suggests he is trying to compel Defendants to conclude his detention is wrongful, a form of judicial review the APA clearly bars.[3] But Plaintiff cannot skirt this reviewability problem by maintaining he is only seeking to have Defendants make the relevant inquiry into his situation. That is the same approach the plaintiffs took in *Heckler*: The APA lawsuit in *Heckler* did not try to dictate the ultimate outcome FDA would reach, but

[3] *See* Compl. ¶ 46 ("[T]he fact that the Plaintiff is an American detained in Russia alone warrants a determination that he is unlawfully or wrongfully detained.").

rather sought to compel the FDA to take up the inquiry of whether states were violating federal law by using certain drugs in their protocols for capital punishment. The Court held, nonetheless, that "decisions not to enforce" particular laws are presumptively unreviewable. *Heckler*, 470 U.S. at 834. Unless Congress evinces an "intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion," that presumption holds. *Id.* Congress did not take those necessary steps in the Hostage Act. The language of the statute is rife with discretionary executive judgments, and "[t]he legislative history of the Act indicates further that failure of the President to take actions required by the Hostage Act 'is not remediable by the courts, nor, perhaps, even Congress, but solely by the electorate.'" *Smith*, 844 F.2d at 201 (quoting *Flynn*, 748 F.2d at 1195); *see also id.* (noting that the Hostage Act "antedated the era of widespread resort to the judiciary to compel executive action"). Accordingly, the Court should dismiss counts 1 and 2 as to the Hostage Act pursuant to § 701(a)(2).

**2. <u>Levinson Act</u>**

To the Government's knowledge, no court has interpreted § 1741(a) of the Levinson Act. Plaintiff contends that the statute requires a "determination" of whether or not he is "detained unlawfully or wrongfully," and that the alleged failure by the Secretary of State to make that determination is reviewable under § 706. Compl. ¶¶ 24, 76, 80. But like the Hostage Act, the Levinson Act concerns decisions (*i.e.*, whether to make a determination as to the detention status of an U.S. citizens imprisoned by a foreign government) that fall within an area courts have traditionally found to be subject to "a general presumption of unreviewability." *Heckler*, 470 U.S. at 834; *Asylum Seekers*, 104 F.3d at 1353. Although the State Department acknowledges that the Levinson Act imposes certain reporting and support obligations with respect to individuals for whom it has made a determination of wrongful detention, it has never understood the statute to require status determinations with respect to particular individuals detained overseas. RESOURCE GUIDE 15. And like the Hostage Act,

nothing in the Levinson Act suggests that Congress intended to create a judicially reviewable duty to make a specific "determination" with respect to any specific U.S. national imprisoned overseas *See* 22 U.S.C. § 1741f ("Nothing in this subchapter may be construed to authorize a private right of action.").

As directed by the Supreme Court, we look first to the plain language of the statute. *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009). The Levinson Act instructs that the Secretary of State "shall review, as expeditiously as possible, the cases of United States nationals detained abroad to determine if there is credible information that they are being detained unlawfully or wrongfully." 22 U.S.C. § 1741(a). This instruction—to "review . . . the cases of United States nationals detained abroad," prior to "determin[ing] whether any of them are being "unlawfully or wrongfully detained"—does not create an obligation to make a specific determination as to the status of each U.S. national detained overseas, of whom there are thousands. The use of the plural—"review . . . the cases"—confirms that the Secretary's obligation to review such cases is of a general nature as to all U.S. nationals detained overseas.

In *Heckler*, the plaintiffs advanced a similar statutory interpretation argument to the one Plaintiff advances here, asserting that criminal provisions "stat[ing] baldly that any person who violates the Act's substantive prohibitions 'shall be imprisoned . . . or fined'" had the effect of "mandat[ing] criminal prosecution of every violator of the Act." *Heckler*, 470 U.S. at 835. The Court, noting "no indication in case law or legislative history" of such an intent, refused "to attribute such a sweeping meaning to this language." *Id.* So too here: Congress no more intended to subject the Secretary's duties under the Levinson Act to judicial review than it intended to subject the FDA's enforcement discretion to judicial review because a criminal statute directs the punishment of "any person" who committed certain acts. In light of the Executive Branch's prerogatives in the area of foreign affairs, Congress would have used far more specific language had it intended to create a judicially enforceable "duty of inquiry" with respect to every one of the thousands of U.S nationals imprisoned overseas.

Taken as a whole, § 1741 confirms that Congress did not intend for the judiciary to

have a role reviewing the Secretary's enforcement of the statute. The statute provides that review shall take place "as expeditiously as possible," but provides no benchmarks or guidelines as to what that timeframe might be. Nor does it provide a definition of what it means for there to be "credible information" that a person is "being detained unlawfully or wrongfully." It does not define what is meant by "unlawful" or "wrongful" such that a court could review that determination. Although the statute provides the determination can be "based on criteria which *may* include" eleven possible indicia of "unlawful" or "wrongful" detention, the drafting of the statute demonstrates the Secretary does not have to rely on any of these indicia, and can choose his own if he wishes. The indicia themselves are rife with subjective determinations that the Executive Branch is clearly in a superior position to address, such as whether diplomatic engagement is necessary to secure the individual's release, *id.* § 1741(a)(11), or whether detention is intended to "influence United States Government policy," *id.* § 1741(a)(3). Finally, the statute gives no indication of how a Court would decide if the Secretary of State has balanced these considerations properly in making a discretionary determination based "on the totality of the circumstances." *Id.* § 1741(b)(1). The statute as a whole therefore reaffirms the "unsuitability" of the Levinson Act for judicial review. *Heckler*, 470 U.S. at 831.

Placing this statutory text in the "specific context in which [it] is used" bolsters this conclusion. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Thousands of Americans find themselves imprisoned overseas each year, and "[m]ost such cases of U.S. nationals arrested or detained overseas arise out of legitimate law enforcement and judicial processes." *SPEHA Webpage*. Although providing support to U.S. citizens detained overseas is a critical mission for the State Department, it has also long been the case that the State Department maintains neutrality as to the legal validity of a citizen's imprisonment, except in extremely rare circumstances. *Arrest and Detention Advisory*. If correct, Plaintiff's reading of the statute would dramatically alter that presumption and require the Secretary of State, in each of the thousands of detention cases in which the State Department provides assistance every year,

to examine whether every single one of those detentions is "wrongful." This would not be a reasonable use of the Secretary of State's limited bandwidth, and Congress did not intend to tie the Secretary of State's hands with respect to an area of foreign affairs involving such sensitive political and foreign policy implications. The State Department "is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Heckler*, 470 U.S. at 831–32,

Finally, an absence of *judicial* review should not be conflated with an absence of meaningful scrutiny of how Defendants carry out the Levinson Act. As is fitting given its critical role in foreign affairs, Congress, through its oversight, funding, and legislative powers, has powerful tools to ensure Defendants are appropriately carrying out their responsibilities under the Levinson Act. The Levinson Act has been amended twice since it became law in 2020, reflecting Congress's continued interest in, and scrutiny of, this area—though notably, despite these amendments, Congress has declined to create a private right of action or otherwise impose a "duty of inquiry" on the State Department. *See* Pub. L. 117-263, Div. I, Title XCI, § 9102, 136 Stat. 3858 (Dec. 23, 2022); Pub. L. 118-31, Div. F, Title LXIV, § 6409, 137 Stat. 1003 (Dec. 22, 2023). A reading of § 1741(a) as permitting for judicial review would interject the Judicial Branch into an issue that falls peculiarly within the expertise of the Executive and Legislative Branches. *Oetjen*, 246 U.S. at 302. The Court should decline to do so and dismiss Plaintiff's APA claims under the Levinson Act pursuant to § 701(a)(2).

### B. At A Minimum, The Court Should Dismiss Count 1 Because Neither Statute Creates A "Duty of Inquiry"

Even if the Court were to conclude that decisions to conduct (or not conduct) an inquiry under either the Hostage Act or Levinson Act could be subjected to some form of judicial review under the APA, the Court should still avoid the conclusion that these statutes create a *duty* of inquiry enforceable through a § 706(1) action. While the APA authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), it does so "only within strict limits," *Anglers Conservation Network v. Pritzker*, 809 F.3d

664, 668, 670 (D.C. Cir. 2016). Courts can compel only "discrete agency action that [an agency] is required to take," *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 64 (2004)—that is, where a statute or regulation imposes a "ministerial or non-discretionary" duty amounting to a "specific, unequivocal command," *id.* at 63-64. This standard reflects the common-law writ of mandamus, which the APA "carried forward" in Section 706(1). *Id.* at 63 ("The mandamus remedy was normally limited to . . . the ordering of a precise, definite act . . . about which [an official] had no discretion whatever[.]") (citation omitted). "[W]here an alleged 'duty is not . . . plainly prescribed, but depends on a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus'" or by its successor, § 706(1). *Power v. Barnhart*, 292 F.3d 781, 786 (D.C. Cir. 2002) (quoting *Consol. Edison Co. of N.Y. v. Ashcroft*, 286 F.3d 600, 605 (D.C. Cir. 2002)).

Neither the Hostage Act nor the Levinson Act require Defendants to undertake the "determination" Plaintiff seeks here. As to the Hostage Act, a judge of this Court has already held, in a mandamus posture, that the statute creates no "duty of inquiry," and that cases holding the contrary are wrongly decided. *Abu Ali*, 350 F. Supp. 2d at 66–67 & n.37. That holding applies with equal force to a § 706(1) claim. As to the Levinson Act, the statute's generalized instruction to the Secretary to "review . . . the cases" of U.S. nationals detained overseas is not the sort of "specific, unequivocal command" to undertake a review and make a determination in Plaintiff's individual case that would render a § 706(1) claim successful. Identifying such a judicially enforceable duty would be an invitation for U.S. nationals detained overseas to entangle the courts in the State Department's response to their detention based on an alleged failure to determine their detention is "wrongful"—and in so doing, foist an unworkable burden on the Secretary of State that Congress did not intend to impose. Accordingly, Plaintiff, for these reasons and those given in section III.A, *supra*, has no § 706(1) claim against Defendants.

## IV. <u>The Claims Against The President Should Be Dismissed Because There Is No Cause Of Action To Sue Him (All Counts)</u>

Plaintiff also lacks a cause of action to sue the President. The actions of the President are not reviewable under the APA because the President is not an "agency" within the meaning of the APA, *see Dalton v. Specter*, 511 U.S. 462, 469 (1994), and likewise there is no implied equitable cause of action to bring suit against the President. Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308, 319 (1999). Moreover, the Supreme Court has twice held that causes of action that are available against other government officials should not be extended to the President absent a clear statement by Congress. *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982) (declining to assume that *Bivens* and other implied statutory damages "cause[s] of action run[] against the President of the United States"); *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (declining to find cause of action against the President under the APA "[o]ut of respect for the separation of powers and the unique constitutional position of the President"). Lower courts have followed the logic of cases like *Franklin* by dismissing the President as a defendant in civil cases and declining to impose either declaratory or injunctive relief against him in his official capacity.[4]

Here, Plaintiff's Hostage Act claim must be dismissed because the statute does not create a private cause of action against the President that would make up for the unavailability of APA review. In *Smith v. Reagan*, the Fourth Circuit recognized that "[t]he Hostage Act

---

[4] *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017) ("In light of the Supreme Court's clear warning that such relief should be ordered only in the rarest of circumstances we find that the district court erred in issuing an injunction against the President himself."); *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017), *vacated as moot*, 138 S. Ct. 377 (2017) ("the extraordinary remedy of enjoining the President is not appropriate here"); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief . . . .") (internal citations omitted); *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing "the President himself as a party to this case").

does not create an explicit private right of action." 844 F.2d at 201. It also "declined to infer" such an action because the statute "treads on matters of foreign policy which have long been recognized as the exclusive province of the political branches," appears to provide for congressional oversight as a remedy, and was enacted by Congress "with the understanding that it created only those rights of action explicit in the text of the statute." *Id.* at 201–02. Because no government official other than the President is implicated by the Hostage Act, the Court should dismiss all claims in this case arising under that statute.

As to the Levinson Act, Congress explicitly disclaimed that the statute would give rise to a private cause of action. 22 U.S.C. § 1741f. In addition, because the Levinson Act does not impose any duties on the President, and if there is any relief potentially available under the statute it could be obtained through appropriate suit against the relevant officials in the State Department, the President can be completely dismissed from the case at this stage. *See Swan v. Clinton*, 100 F.3d 973, 978 (1996) ("In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials.").

## V. <u>The Mandamus and Venue Act (Count 3) And Declaratory Judgment Act (Count 4) Claims Should Be Dismissed</u>

Finally, Plaintiffs allege claims under (1) the federal mandamus statute, 28 U.S.C. § 1361, and (2) the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02. But neither statute can compensate for the shortcomings of their claims under the APA.

### A. <u>Mandamus Is Not Available</u>

Mandamus is a "drastic" remedy that "is available only in 'extraordinary situations,'" and is "hardly ever granted." *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc). "A court may grant mandamus relief only if: (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to [the] plaintiff." *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020) (quoting *Baptist Mem'l Hosp.*

*v. Sebelius*, 603 F.3d 57, 62 (D.C. Cir. 2010)).

As explained above in connection with Plaintiff's claim under §706(1), *see supra* § III, Plaintiff's claim fails at steps one and two of the mandamus test because the Hostage Act and Levinson Act do not create a clear right to the relief Plaintiff seeks, and the government has no legal duty to undertake the inquiry or determination that Plaintiff has requested. Plaintiff also fails to meet the third hurdle because his complaint already alleges an adequate alternative remedy to mandamus: a claim under 5 U.S.C. § 706(1), which, as discussed, is intended to displace mandamus in situations where it applies. Whether Plaintiff's APA claim would ultimately succeed does not bear on whether there is an adequate remedy, for the inquiry turns on whether an alternate forum, statute, or administrative process exists to adjudicate the claim. *See, e.g., Upton v. Birotte*, No. CIV.A.11-1332, 2011 WL 2938134, at *1 (D.D.C. July 21, 2011) (concluding that mandamus relief was foreclosed because "the federal appeals process provides an adequate remedy for petitioner"). As such, regardless of how it resolves Defendants' threshold APA arguments, the Court should dismiss Count 3.

**B. <u>The Declaratory Judgment Act Count Must Be Dismissed</u>**

A "claim" for a declaratory judgment is a misnomer. The Declaratory Judgment Act provides for a particular type of remedy in civil cases, but it does not give rise to a cause of action or create an independent source of federal jurisdiction. *Metz v. BAE Sys Tech. Sols. & Servs. Inc.*, 774 F.3d 18, 25 n.8 (D.C. Cir. 2014). As such, there is no freestanding claim for the Court to "declare" that Defendants have violated the Hostage Act, the Levinson Act, or the APA. Count 4 should therefore be dismissed.

****

## CONCLUSION

For all these reasons, the Court should grant Defendants' motion to dismiss the complaint.

Dated: July 29, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

LAUREN A. WETZLER
Deputy Director

*/s/ Michael J. Gerardi*
Michael J. Gerardi (D.C. Bar No. 1017949)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, Room 12002
Washington, D.C. 20005
Tel: (202) 616-0680
Fax: (202) 616-8460
E-mail: michael.j.gerardi@usdoj.gov

*Attorneys for Defendants*