Lawrence S. Lustberg, Esq.*
Ruth O'Herron, Esq.*
John J. Gibbons Fellowship in
Public Interest & Constitutional Law
Gibbons P.C.
One Gateway Center
Newark, NJ 07102
(973) 596-4500
llustberg@gibbonslaw.com
roherron@gibbonslaw.com
**admitted pro hac vice*
*Attorneys for Plaintiff James Vincent Wilgus*

Caroline E. Oks, Esq. (D.D.C. Bar No. 1045607)
Gibbons P.C.
500 North Capitol Street NW, Suite 310
Washington, DC 20001
(202) 655-2760
coks@gibbonslaw.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| JAMES VINCENT WILGUS,<br>Prison Labor Camp IK-17, Republic of Mordovia, Russia 431161<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE,<br>2201 C St. NW, Washington, DC 20520, *et al*.,<br><br>Defendants. | Civil Action No. 24-1384 (JMC)<br><br>Judge Jia M. Cobb |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

PROCEDURAL HISTORY ........ 2

FACTUAL BACKGROUND ........ 2

STANDARD OF REVIEW ........ 5

ARGUMENT ........ 6

I. PLAINTIFF HAS SUFFICIENTLY PLEADED HIS CLAIMS FOR RELIEF. ........ 6

A. Applicable Legal Frameworks ........ 7

B. In the Levinson Act, Congress Imposed at Least Six Discrete, Mandatory Duties on Defendants That Defendants Have Not Performed. ........ 10

C. In the Hostage Act, Congress Imposed at Least Four Discrete, Mandatory Duties on the President That Defendants Have Not Performed. ........ 12

D. Plaintiff Does Not Seek Review of Any Discretionary Agency Action. ........ 18

II. PLAINTIFF HAS STANDING TO BRING HIS CLAIMS ........ 22

III. PLAINTIFF'S CLAIMS FOR MANDAMUS AND DECLARATORY RELIEF ARE PROPER AND SHOULD NOT BE PREMATURELY DISMISSED. ........ 26

CONCLUSION ........ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28 (D.D.C. 2004)........................................... 15, 18, 19

*Abulhawa v. U.S. Dep't of the Treasury*, 239 F. Supp. 3d 24 (D.D.C. 2017)............................. 27

*Afghan & Iraqi Allies v. Pompeo*, Civil Action No. 18-cv-01388 (TSC), 2019 U.S. Dist. LEXIS 14465 (D.D.C. Jan. 30, 2019)............................................................ 26

*Ali v. Rumsfeld*, 649 F.3d 762 (2011). ...................................................................................... 31

*Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183 (D.C. Cir. 2016)............................................... 10, 22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........................................................................................ 6

*Babaei v. United States Dep't of State*, Civil Action No. 23-1244 (TJK), 2024 U.S. Dist. LEXIS 47952, at *9 (D.D.C. Mar. 19, 2024).................................................. 26

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)......................................................................... 6

*Brock v. Pierce Cnty*., 476 U.S. 253 (1986). ................................................................................ 8

*Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004). ............................................................ 10

*Cox v. Sec'y of Labor*, 739 F. Supp. 28 (D.D.C. 1990). ............................................................. 10

*Dames & Moore v. Regan*, 453 U.S. 654 (1981)........................................................... 15, 16, 17

*Erby v. United States*, 424 F. Supp. 2d 180 (D.D.C. 2006)......................................................... 5

*Farrell v. Blinken*, 4 F.4th 124 (D.C. Cir. 2021). ........................................................................ 10

*Flynn v. Shultz*, 748 F.2d 1186 (7th Cir. 1984)...................................................... 14, 16, 19, 20

*Heckler v. Chaney*, 470 U.S. 821 (1985)..................................................................................... 22

*Heckler v. Ringer*, 466 U.S. 602 (1984). ..................................................................................... 11

*In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413 (D.C. Cir. 2004). .................................. 22

*In re Core Commc'ns, Inc.*, 531 F.3d 849 (D.C. Cir. 2008)........................................................ 9

*In re People's Mojahedin Org. of Iran*, 680 F.3d 832 (D.C. Cir. 2012)..................................... 22

*Kareem v. Haspel*, 986 F.3d 859 (D.C. Cir. 2021). ...................................................................... 6

*Kendall v. United States*, 37 U.S. 524 (1838). ........ 24

*Khazaei v. Blinken*, Civil Action No. 23-1419 (JEB), 2023 U.S. Dist. LEXIS 164822 (D.D.C. Sep. 18, 2023) ........ 28

*Kingdomware Techs., Inc. v. United States*, 579 U.S. 162 (2016). ........ 11

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024). ........ 8

*Lopez v. Davis*, 531 U.S. 241 (2001). ........ 11

*Lovitky v. Trump*, 949 F.3d 753 (D.C. Cir. 2020). ........ 30

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990). ........ 8

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). ........ 1

*Marwah Al Ihsan Al-Gharawy v. U.S. Dep't of Homeland Sec.*, 617 F. Supp. 3d 1 (D.D.C. 2022). ........ 27, 28

*Medtronic, Inc. v. Mirowski Family Ventures*, LLC, 571 U.S. 191 (2014). ........ 31

*Moghaddam v. Pompeo*, 424 F. Supp. 3d 104 (D.D.C. 2020). ........ 5, 6

*Morinville v. United States PTO*, 442 F. Supp. 3d 286 (D.D.C. 2020). ........ 32

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29 (1983). ........ 10

*Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974). ........ 24

*Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Kerry*, 168 F. Supp. 3d 268 (D.D.C. 2016). ........ 26

*Norton v. S. Utah Wilderness All*., 542 U.S. 55 (2004). ........ 9

*Redpath v. Kissinger*, 415 F.Supp. 566 (W.D.Tex. 1976). ........ 20

*Scheuer v. Rhodes*, 416 U.S. 232 (1774). ........ 6

*Schilling v. Rogers*, 363 U.S. 666 (1960). ........ 31

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016). ........ 25

*Telecommunications Research & Action Ctr. v. FCC* , 750 F.2d 70 (D.C. Cir. 1984). ........ 9

*United States v. Texas*, 599 U.S. 670 (2023). ........ 25

*Upton v. Birotte*, Civil Action No. 11-1332, 2011 U.S. Dist. LEXIS 79137 (D.D.C. July 20, 2011). .... 29

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). .... 31

*Worthy v. Herter*, 270 F.2d 905 (D.C. Cir. 1959). .... 20

*Zivotofsky v. Clinton*, 566 U.S. 189 (2012). .... 24

**Statutes**

22 U.S.C. § 1732 .... passim

22 U.S.C. § 1741 .... passim

28 U.S.C. § 1361 .... 7, 9, 26

28 U.S.C. § 2201 .... 7, 9, 10

5 U.S.C. § 551 .... 7, 8

5 U.S.C. § 551(13) .... 8

5 U.S.C. § 701(a)(2) .... 8, 19, 20

5 U.S.C. § 702 .... 8

5 U.S.C. § 706(1) .... 7, 8, 9

5 U.S.C. § 706(2)(A) .... 7, 8

**Rules**

Fed. R. Civ. P. 8 .... 6, 26, 28

Fed. R. Civ. P. 12(b)(1) .... 5

Fed. R. Civ. P. 12(b)(6) .... 5, 6

Fed. R. Civ. P. 57 .... 10

**PRELIMINARY STATEMENT**

"It is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), and this lawsuit asks this Court to fulfill this constitutional responsibility in interpreting a significant statute, the Levinson Act, which Congress passed in 2020 to assist and protect the lives of Americans like Plaintiff who are victims of the increasingly prevalent phenomenon of wrongful detention by a foreign government. In deciding whether or not the Levinson Act means what it says, as Plaintiff contends, the Court is asked to assure no more than that the will of Congress be carried out. But beyond the legal implications of this motion, and of the lawsuit to which it is addressed, the case has very real, human implication, for Plaintiff's very survival is at stake here.

Fortunately, the burden thus visited on the Court is lessened because the text of the Levinson Act, and that of its predecessor known as the Hostage Act, are unambiguous with respect to the questions presented in this case. No complex tools of statutory interpretation are needed to discern that, since 1868, the Hostage Act has required the Executive Branch to inquire into, and meaningfully review, the circumstances of any American citizen's detention by a foreign government to determine if the individual is wrongfully detained. Likewise, since 2020, the Levinson Act has required Defendants to review such cases and specifically mandated that the Executive Branch make a determination as to whether there is credible information that the individual at issue is unlawfully or wrongfully detained. For their parts, Defendants do not pretend they have followed these laws—in fact, their legal position is that they cannot be required to follow them—so the Court's role in this lawsuit is uncomplicated: to ascertain whether Congress meant what it said and to require Defendants to follow certain of its very straightforward commands. An order requiring Defendants to follow the law is all the relief Plaintiff asks; Defendants' motion to

dismiss misses this point and, in so doing, mischaracterizes what Plaintiff seeks. That motion should be denied.

## PROCEDURAL HISTORY

Plaintiff, who is imprisoned in Russia, filed his initial complaint in this lawsuit through the undersigned *pro bono* counsel on May 13, 2024. ECF No. 1. A corrected version of the Complaint, which made no changes to the body of the complaint, was filed the following day. ECF No. 2-1 ("Complaint"). The Complaint asserts four causes of action arising under the Administrative Procedures Act ("APA") (Counts I and II), the Mandamus and Venue Act (Count III), and the Declaratory Judgment Act (Count IV), all of which relate to the Government's violations of the 2020 Robert Levinson Hostage Recovery and Hostage-Taking Accountability Act (the "Levinson Act") and a prior 1868 law known as the Hostage Act. On July 29, 2024, Defendants moved to dismiss the Complaint, asserting brazenly that these laws are merely "guidance," and that they "have no legal duty to undertake the inquiry or determination" that Plaintiff seeks in this action, notwithstanding the clear mandates of these statutory provisions. *See* ECF No. 20-1 (Defs Br.) at 3, 5, 21. Plaintiff was granted until September 9, 2024, to file this opposition. *See* Minute Orders Granting ECF Nos. 22–23.

## FACTUAL BACKGROUND[1]

In 2016, Plaintiff was living in Russia, producing music for films and occasionally performing with his band, and newly married to his wife, Elena, a Russian citizen whom he had met while visiting Russia a few years earlier. *See* Compl. ¶ 1, 57. As a musician who stayed out of politics, he never imagined he would become a pawn in the hostilities between his native country

[1] Plaintiff does not here repeat the entirety of the allegations included in his Complaint, which he incorporates by reference as if fully set forth herein.

and Elena's. But on November 7, 2016, Plaintiff's life turned into a horrible nightmare: he was detained by Russian authorities, put through a Kafkaesque "trial" in which he was convicted of several crimes he did not commit, and sentenced to spend twelve and a half years at hard labor in a Russian penal colony. *Id.* ¶¶ 1 45, 60.

Since the time of Plaintiff's initial arrest by Russian authorities, three—soon to be four—presidential administrations have held office in the United States; meanwhile, Congress, in 2020, enacted the Levinson Act to better protect Americans like Jimmy who are wrongfully imprisoned by foreign governments. And, all along, Plaintiff's advocates have been unrelenting in their efforts to draw Defendants' attention to his dire circumstances and to the unlawful, wrongful, and inhumane nature of his detention. *Id.* ¶¶ 23, 32. Tragically, none of this has made a difference.

Eight years later, Plaintiff still lives out that nightmare: he wakes up every morning in a prison cell at IK-17, a labor camp deep in the forest in Mordovia, Russia, where he does not speak the language and both prison authorities and prisoners alike consider him an enemy. *Id.* ¶¶ 52–60. Beginning at 5:00 a.m., he stands outside in freezing temperatures for roll call, and then to goes to work spending most of his waking hours in a heavily polluted factory cutting tiny threads off of clothing (and frequently cutting himself in the process). *Id.* ¶¶ 54–55, 58. He is subjected to violence by other inmates and prison authorities with impunity. *Id.* ¶ 56. And based on fabricated charges, he is regularly sent to an even more punitive solitary confinement cell known as "Shizo," where he is locked in a room only as wide as his arm span, forced to stand or sit on a bench for sixteen hours a day, and not told how long he will be there—on one occasion, he spent 118 consecutive days in Shizo. *Id.* ¶¶ 56–57. Plaintiff is denied even the most essential healthcare, a fact that became all the more terrifying after he suffered a stroke in 2022. *Id.* ¶ 59. His mental

and physical health, and the conditions at IK-17, are rapidly deteriorating with each passing day. *Id.* ¶¶ 1, 3, 59.

While it is Russian authorities inflicting this physical cruelty on Plaintiff each day, Plaintiff's own government is also complicit, as it is neglecting him in clear contravention of the will of Congress as set forth in the Hostage Act and the Levinson Act. *Id.* ¶¶ 18–30. As explained in greater detail below, Congress has long required the Executive Branch to take swift action whenever an American is detained by a foreign government, but Defendants have ignored Congress's clear commands to act on Plaintiff's behalf, while at the same time acting swiftly in the cases of other, more celebrated or favored Americans wrongfully detained in Russia. *Id.* ¶¶ 31–41. Among other mandates, Congress requires the Secretary of State to "review, as expeditiously as possible, the cases of United States nationals detained abroad to determine if there is credible information that they are being detained unlawfully or wrongfully." 22 U.S.C. § 1741(a); Compl. ¶ 24. This initial determination matters a great deal: it is necessary to trigger most of the other actions required by the Levinson Act, and the cases of others show that no meaningful negotiations for Plaintiff's release will even begin until this determination is made. *Id.* ¶¶ 30, 41, 70; *see also* 22 U.S.C. § 1741(b) (transferring cases to the Special Presidential Envoy for Hostage Affairs only after a determination is made). Thus, Defendants have negotiated the release of five American citizens detained in Russia in the past two years, and in each case they have first determined that the individual was wrongfully detained. *Id.* ¶¶ 36–41.[2] By refusing to follow the Hostage Act and

[2] Plaintiff filed his Complaint fearing he would be left out of the "ongoing negotiations" in which Defendants publicly acknowledged they were engaged to free Evan Gershkovich and Paul Whelan. Compl. ¶ 70. On August 1 of this year, that fear was realized: three American citizens were brought home from Russia, but Plaintiff was—once again—left behind. *See* Ken Thomas & Gordan Lubold, *Freed Evan Gershkovich Arrives in the U.S. to a Hero's Welcome*, Wall Street Journal (Aug. 2, 2024), https://www.wsj.com/world/evan-gershkovich-us-andrews-32fee381. The five American citizens brought home since 2022 are Trevor Reed, Brittney Griner, Evan

the Levinson Act, and avoiding even making this determination in Plaintiff's case as required, Defendants have unlawfully relegated Plaintiff to a second-class status that is contrary to the law, including the Levinson Act and the Hostage Act.

## STANDARD OF REVIEW

Defendants bring their motion under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). A motion to dismiss under Rule 12(b)(1) "may raise either a 'facial' or a 'factual' challenge to the [Plaintiff's] claim of subject matter jurisdiction." *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006). Here, Defendants raise only a facial challenge, contesting the "legal sufficiency of the plaintiff's jurisdictional allegations"; they could not and do not, in their pleadings, dispute "the factual basis for jurisdiction" or assert competing facts. *Id*. at 182–83; *see* Defs. Br. at 10 (stating that the Court must accept the factual allegations in the complaint as true in deciding the motion). A motion to dismiss under Rule 12(b)(6) asserts that a complaint should be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

In deciding either a Rule 12(b)(1) motion raising a facial challenge to subject matter jurisdiction and a Rule 12(b)(6) motion, courts must accept the facts asserted in the complaint as true and construe the complaint liberally, "draw[ing] inferences in favor of the plaintiff." *Ho v. Garland*, 106 F.4th 47, 50, 54 (D.C. Cir. 2024); *see Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 111–112 (D.D.C. 2020). Ultimately, a plaintiff need only establish subject matter jurisdiction by a preponderance of the evidence to survive a motion to dismiss under Rule 12(b)(1). *Moghaddam*, 424 F. Supp. 3d at 111. In assessing whether it has jurisdiction at the motion to dismiss stage, the

---

Gershkovich, and Paul Whelan, *see* Compl. ¶¶ 36–41, along with Alsu Kurmasheva, who was not sentenced and declared wrongfully detained until after the Complaint was filed. But the point is that each of these were denominated wrongfully detained.

Court may consider materials outside the pleadings, though it must still accept all of the factual allegations in the complaint as true. *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021).

The Federal Rules of Civil Procedure require that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2). A claim satisfies this standard, and thus survives a motion to dismiss under Rule 12(b)(6), if the allegations in the complaint, accepted as true, "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The dispositive issue in deciding a motion to dismiss under Rule 12(b)(6) "is not whether a plaintiff will ultimately prevail but whether [he] is entitled to offer evidence to support the claims." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1774)).

## ARGUMENT

### I. PLAINTIFF HAS SUFFICIENTLY PLEADED HIS CLAIMS FOR RELIEF.

The Court should reject Defendants' arguments that Plaintiff has failed to state a claim. Contrary to Defendants' assertion that these laws are merely "guidance," Defs Br. at 3, 5, both the Levinson Act and the Hostage Act *require* Defendants to perform certain actions with regard to Plaintiff, which they do not have the discretion to simply refuse to perform. Plaintiff has alleged—and Defendants do not dispute—that these actions have not yet been performed, almost eight years after Plaintiff's wrongful detention in Russia began and four years after the Levinson Act was enacted. Plaintiff has also alleged that Defendants' failure to act in his case, particularly while acting swiftly in the cases of other Americans detained abroad, demonstrates both the arbitrariness and irrationality of the Government's breaches of the law and the significance of its inaction. Taking all of this together, Plaintiff has sufficiently pleaded claims for unreasonably delayed

agency action under 5 U.S.C. § 706(1) (Count One), arbitrary and capricious agency action under 5 U.S.C. § 706(2)(A) (Count Two), and for related relief under the Mandamus and Venue Act ("Mandamus Act") and Declaratory Judgment Act (Counts Three and Four).

It is important that the limits of Plaintiff's argument be clear: Plaintiff does not here seek judicial review of the merits of Defendants' determination of whether or not he is wrongfully detained—he simply requests that Defendants be required to make a determination that Congress directed them to make and to do so "expeditiously." 22 U.S.C. § 1741(a); *see also* 22 U.S.C. § 1732 (directing the President to demand information about American citizens detained abroad "forthwith"). The majority of Defendants' arguments are based on the false premise that Plaintiff is challenging an Executive Branch determination, but that is completely unfaithful to the Complaint before the Court, which is laser-focused not on what the Executive Branch has done, but upon its failure to act at all. *See* Compl. ¶¶ 1, 22, 30–35, 64, 68–71.

Similarly beside the point is the Defendants' argument that the Levinson Act and Hostage Act do not authorize a private right of action. *See* Defs Br. at 3, 8, 23, 27–28. That is because the Complaint does not assert a right of action based on those statutes; Plaintiff has only brought his claims under the APA, 5 U.S.C. § 551, *et seq*., the Mandamus and Venue Act, 28 U.S.C. § 1361, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, which claims are sufficiently pleaded for the reasons set forth below. *See* Compl. ¶¶ 15–16, 72–92; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (distinguishing between a private right of action under a given statute and a right of action under the APA relating to action required by a certain statute).

**A. Applicable Legal Frameworks**

Under the judicial review provisions of the APA, federal courts are tasked with ensuring that agencies carry out the work Congress has directed them to perform. The APA "entitles any person 'adversely affected or aggrieved by agency action,'" or (as set forth below) inaction, to

judicial review, "unless the relevant statute precludes judicial review or 'agency action is committed to agency discretion by law.'" *Brock v. Pierce Cnty.*, 476 U.S. 253, 260 n.7 (1986) (quoting 5 U.S.C. §§ 701(a)(2), 702); 5 U.S.C. § 551(13). "[T]he role of the reviewing court under the APA is . . . to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024).

Where, as here, an agency is unreasonably delayed in taking action that Congress directed it to take, the APA directs that federal courts "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). In doing so, courts do not interfere with the separation of powers or get involved in making foreign policy—under both Section 706(1) of the APA and the Mandamus Act, courts can only compel an agency "to take action upon a matter, without directing *how* it shall act"—and Defendants' characterization of Plaintiff's complaint as seeking anything beyond that is inaccurate and unfair. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64, (2004) (quotation marks omitted) (emphasis in original). Thus, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Id.* at 64. And that is precisely the claim asserted here, which is one of unreasonable delay, governed in this Circuit by the six factors set forth in *Telecommunications Research & Action Ctr. v. FCC ("TRAC")*, 750 F.2d 70, 79 (D.C. Cir. 1984). *See In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008).

The APA also directs federal courts to "hold unlawful . . . agency action" that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)). Notably, the term "agency action" is defined in the APA to include an agency's "failure to act" as well as its affirmative actions. 5 U.S.C. § 551(13). For both, the APA requires that "agency action must be the product of reasoned decisionmaking," and the decisions it makes

must be "logical and rational." *Farrell v. Blinken*, 4 F.4th 124, 137 (D.C. Cir. 2021) (quotation marks omitted). Moreover, a court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted).

Pursuant to the Mandamus Act, 28 U.S.C. § 1361, this Court has the power to "compel an officer or employee of the United States, or any agency thereof to perform a duty owed to the plaintiff." This so-called mandamus relief is warranted when a Plaintiff demonstrates "(1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). As with the "agency action" sought to be compelled in a claim under § 706(1) of the APA, the "duty owed" under the Mandamus Act must in fact be *owed*; it may not be a duty that the federal officer has discretion to perform or not perform. "It is well-settled that a writ of mandamus is not available to compel discretionary acts." *Cox v. Sec'y of Labor*, 739 F. Supp. 28, 30 (D.D.C. 1990). "No § 1361 writ may issue, in other words, when federal law grants discretion to the federal officer, rather than imposing a duty on him. When federal law imposes an obligation, however, suit under § 1361 is not precluded simply because facts must be developed to ascertain whether a federal command has been dishonored." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 404 n.8 (2004) (Ginsburg, J., dissenting) (discussing *Heckler v. Ringer*, 466 U.S. 602, 616 (1984)).

Finally, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, this Court has the power and responsibility to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," and to grant other relief as necessary or proper to such a judgment. 28 U.S.C. §§ 2201, 2202. Such declaratory

judgments "have the force and effect of a final judgment." 28 U.S.C. § 2201. "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57.

### B. In the Levinson Act, Congress Imposed at Least Six Discrete, Mandatory Duties on Defendants That Defendants Have Not Performed.

Congress uses the word "shall" to impose mandatory, "discretionless obligations" on executive agencies. *Lopez v. Davis*, 531 U.S. 230, 241 (2001); *see also Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016) ("When a statute distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty."). In using the term "shall" in the Levinson Act, 22 U.S.C. § 1741 *et seq.*, Congress imposed at least six mandatory duties on State Department officials relating to individuals like Plaintiff who are "United States nationals detained abroad." 22 U.S.C. § 1741(a).[3]

*First*, the Levinson Act requires that the Secretary of State review the individual's case, and *second*, it requires the Secretary, having done so, to make a determination: "The Secretary of State shall review, as expeditiously as possible, the cases of United States nationals detained abroad to determine if there is credible information that they are being detained unlawfully or wrongfully," based on a list of criteria. 22 U.S.C. § 1741(a). This initial determination under Section 1741(a)—hereinafter referred to as a "Levinson Act Determination"—is essential because it triggers all of the other requirements imposed on Defendants by the Levinson Act. *Third*, if the Levinson Act Determination is that there is credible information of wrongful detention, the Levinson Act requires transferring those cases to the Special Presidential Envoy for Hostage

[3] In addition, the Levinson Act codifies the establishment of executive offices responsible for aiding Americans unlawfully or wrongfully detained abroad and their families, including the Office of the Special Presidential Envoy for Hostage Affairs and the Hostage Recovery Fusion Cell, and describes the specific duties of those offices and of certain officers within them. 22 U.S.C. §§ 1741a–c.

Affairs, and *fourth*, it requires that notice of and information about such cases be provided to Congress within 14 days of when the determination is made:

> **(b) Referrals to Special Envoy; notification to Congress**
>
> **(1) In general** Upon a determination by the Secretary of State, based on the totality of the circumstances, that there is credible information that the detention of a United States national abroad is unlawful or wrongful, and regardless of whether the detention is by a foreign government or a nongovernmental actor, the Secretary shall—
>
>> **(A)** expeditiously transfer responsibility for such case from the Bureau of Consular Affairs of the Department of State to the Special Presidential Envoy for Hostage Affairs; and
>>
>> **(B)** not later than 14 days after such determination, notify the Committee on Foreign Relations of the Senate, the Select Committee on Intelligence of the Senate, the Committee on Foreign Affairs of the House of Representatives, and the Permanent Select Committee on Intelligence of the House of Representatives of such determination and provide such committees with a summary of the facts that led to such determination.

22 U.S.C. § 1741(b). *Fifth*, the Levinson Act requires the Secretary to submit a detailed, unclassified annual report to these congressional committees (the "Annual Report"). 22 U.S.C. § 1741(c). The Annual Report must contain highly specific information regarding each of the United States nationals about whom the Secretary has determined "there is credible information of unlawful or wrongful detention abroad." 22 U.S.C. § 1741(c)(1)(A). It must include "current estimates of the number of individuals so detained, as well as relevant information about particular cases," including each individual's name, basic facts about his case, a summary of the information demonstrating that he "may be detained unlawfully or wrongfully," a description of the specific legal and diplomatic efforts taken on behalf of that individual in that year, and a description of "intended next steps." 22 U.S.C. § 1741(c)(2). *And sixth*, the Levinson Act requires the Secretary

to "provide resource guidance in writing for government officials and families of unjustly or wrongfully detained individuals" no later than June 2021. 22 U.S.C. § 1741(d).[4]

### C. In the Hostage Act, Congress Imposed at Least Four Discrete, Mandatory Duties on the President That Defendants Have Not Performed.

Before the Levinson Act was enacted, Congress had previously addressed the situation of Americans wrongfully detained abroad in the 1868 Hostage Act, 22 U.S.C. § 1732, which was in effect at the time Plaintiff was first arrested by Russian authorities on November 7, 2016, and which states as follows:

> Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war and not otherwise prohibited by law, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.

The Hostage Act thus imposes at least four mandatory duties on the President with regard to "any citizen of the United States [who] has been unjustly deprived of his liberty by or under the authority of any foreign government" such as Plaintiff. 22 U.S.C. § 1732. These four requirements, each delineated by the use of the term "shall," are less detailed than those imposed by the Levinson Act but are no less mandatory or urgent. *Id*. *First*, the Hostage Act requires that the President demand reasons for the detention "forthwith" in order to determine whether or not the detention is

---

[4] Resource guidance for families that seems to satisfy the requirements of 22 U.S.C. § 1741(d) is available on the State Department's website. *See* U.S. Dep't of State, Office of the Special Presidential Envoy for Hostage Affairs, *Resources for Families of Wrongful Detainees*, https://www.state.gov/resources-for-families-of-wrongful-detainees/ (last visited Apr. 1, 2024.) However, because Defendants have not made a Levinson Act Determination in Plaintiff's case, his family is not considered one of the "families of unjustly or wrongfully detained individuals" entitled to resource guidance, so Plaintiff is not aware of what other guidance may be provided.

wrongful. *Id*. Courts have referred to this duty to demand reasons as a duty of "inquiry." *Flynn v. Shultz*, 748 F.2d 1186, 1193 (7th Cir. 1984). *Second*—and only if it appears the detention is wrongful—it requires that the President demand the individual's release. *Id*. *Third*, if demanding the individual's release is unsuccessful, it requires that the President act to free the individual through other means. And *fourth*, it requires the President to communicate "all the facts and proceedings" of the individual's case to Congress "as soon as practicable." *Id*.

While the Levinson Act has not yet been interpreted by any court, Defs Br. at 22, a few courts have analyzed the Hostage Act, and the Government correctly describes those courts as being "split on the question" of whether the Hostage Act imposes judicially enforceable duties on the President. Defs Br. at 19–20. Since neither the D.C. Circuit nor the Supreme Court has decided the issue, this Court is unfettered by binding precedent and should reject Defendants' reading of the statute which is contrary to its text and legislative history.

Defendants principally rely on *Dames & Moore v. Regan*, 453 U.S. 654 (1981), and *Abu Ali v. Ashcroft****Error! Bookmark not defined.***, 350 F. Supp. 2d 28 (D.D.C. 2004), in arguing that Plaintiff fails to state a claim for relief under the Hostage Act, but neither of these cases is controlling. The Government's first argument, based on *Dames & Moore*, is that Plaintiff's claims fail because he was not detained "in violation of the rights of American citizenship" as the Supreme Court interpreted that term. Defs Br. at 14–15 (quoting 22 U.S.C. § 1732). But this argument is based on a cursory review of the legislative history by the Supreme Court in *Dames & Moore*—which, famously, issued that opinion only eight days after the case was argued.[5] *See* 453 U.S. at 676. And the Seventh Circuit has since shown, after giving a look closer at the same legislative

[5] Allen S. Weiner & Duncan Pickard, *The $400 million payment to Iran was American diplomacy at its finest*, Stanford Law School Blogs (Aug. 12, 2016), https://law.stanford.edu/2016/08/12/the-400-million-payment-to-iran-was-american-diplomacy-at-its-finest/.

history, that in fact Plaintiff's wrongful detention is exactly the sort the Hostage Act was targeting. Specifically, the Senator who sponsored the Hostage Act described its provisions as follows:

> "[The President] shall ascertain whether that imprisonment is rightful or wrongful, whether or not it violates the rights of American citizenship; and if he ascertains that the imprisonment is unjust and unfounded, that it is made on some frivolous pretext, that it is made for some alleged political opinion which the party entertains to which that Government does not give its sanction, that he shall proceed upon ascertaining the facts and demand the release of that citizen so imprisoned * * *.
>
> * * * I believe it is a fact that the citizens of no civilized country upon the globe receive so little attention in foreign countries from their own government as the citizens of the United States and this law, if it is to amount to anything at all, ought to compel the Executive to proceed forthwith to give attention to these complaints whenever it is alleged * * * that a citizen of the United States is suffering in a foreign prison * * *."

*Flynn*, 748 F.2d at 1196 (quoting 39 Cong. Globe, 40th Cong., 2d Sess. 4233 (1868) (Sen. Williams). Even more to the point, in a passage not cited by the Seventh Circuit, Senator Williams explained that the final text of the Hostage Act was intended to correct for the fact that a prior bill "did not require the President to do anything at all. It empowered him to do certain things in case he saw proper to act; but whether he would act or not was entirely left in his discretion[.]" 39 Cong. Globe, 40th Cong., 2d Sess. 4330 (1868) (Sen. Williams). Senator Williams noted that both political parties at the time had addressed the issue in their political platforms, desiring stronger legislation, and that the Hostage Act he proposed would finally "require[] the President to take some action" and to "regard the rights of all citizens, naturalized and native born, who may be imprisoned or deprived of their liberty in foreign countries." *Id.*

In *Dames & Moore*, the Supreme Court discussed the Hostage Act while addressing a very different set of claims than those brought here, under the backdrop of the Iran Hostage Crisis. There, the defendant was the Secretary of Treasury, and plaintiff was a corporation that, in 1979, had commenced litigation in district court against the Government of Iran and Iranian banks for

$3 million it was owed by contract, and had already obtained orders of attachment against the Iranian defendants' property, when, in 1981, the President—as part of an agreement with Iran that led to the hostages being released—issued executive orders nullifying all non-Iranian interests in Iranian assets. The question before the court was whether the President had authority to issue these executive orders which so harmed the American plaintiff's financial interests; the Court concluded that the President did have that authority, but found the source of that authority in other laws, and not the Hostage Act.

The Supreme Court in *Dames & Moore* was primarily considering the scope of the power permitted under a different clause of the Hostage Act than the one at issue here; the issue was the scope of the provision of the statute stating that "the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release" of any U.S. citizen detained abroad. 22 U.S.C. § 1732. The Court's analysis of the Hostage Act's application to that case was confined to one paragraph, in which it held that it was "reluctant to conclude" that the Hostage Act provided "specific authorization to the President to suspend claims [against Iran] in American courts," since "there [were] several difficulties with such a view." 453 U.S. at 676–77. Among these difficulties was the fact that the "legislative history indicates that the Act was passed in response to a situation unlike the recent Iranian crisis," but also that the legislative history suggested the Hostage Act only allowed for reprisals against the foreign country, not against the interests of Americans like the plaintiff in *Dames & Moore*. *Id*. However, even then, the Supreme Court did not find a clear-cut answer to the question of whether the Hostage Act applied, stating that "the broad language of the Hostage Act suggests it may cover [the] case." *Id*. at 676. In sum, *Dames & Moore* does not foreclose Plaintiff's claims, since its very limited interpretation of the Hostage Act addressed a different legal question in a different factual context,

and a closer look at the legislative history undermines its suggestion that the Hostage Act might only apply to situations where a foreign government is refusing to acknowledge an American's citizenship.

In *Abu Ali v. Ashcroft*, a court in this District also addressed the Hostage Act in a circumstance far different that the one presented here. That case was a habeas petition brought by the parents of an American citizen whose detention in Saudi Arabia was at the behest and supervision of the United States, and the primary question was whether the court was stripped of habeas jurisdiction because the individual was detained in a foreign prison; the Court held that it had jurisdiction. 350 F. Supp. 2d 28, 40 (D.D.C. 2004). The Court discussed the Hostage Act, since the "Petitioners argue[d] that the [Hostage] Act gives rise to a mandatory duty on the part of the President to demand the Saudi Government to release Abu Ali." *Id.* at 66. The court held that it did not create such a duty, and swept more broadly to conclude that the Hostage Act did not "create[] any duty enforceable by a writ of mandamus." *Id*. at 66–67.

*Abu Ali* is not applicable, or persuasive, here. For one thing, the Court's discussion of the Hostage Act in that case was in a context in which the individual was ultimately detained *by* the United States, and the Court's analysis of the Hostage Act came only after it had already determined that it was inapplicable to those facts because the detainee in *Abu Ali* was not detained by a foreign government:

> The charge advanced by the plaintiffs in [other Hostage Act cases] was that a foreign government had unjustly deprived an American citizen of liberty and that the United States was obliged to take a . . . role in obtaining his release. The claim here, on the other hand, is that the United States has unjustly deprived an American citizen of liberty through acts it has already taken, precisely what courts are accustomed to assessing. Although both situations involve the detention of United States citizens overseas, that is where the similarities end.

*Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 65 (D.D.C. 2004). For another, the mandamus order petitioners sought was different—they wanted an order compelling the President "to demand the Saudi Government [] release" their son, which would require a request for judicial override of the wrongful detention determination made by the President. *Id*. at 66. Here, by contrast, Plaintiff does not, at this point, claim that the Executive Branch erred in by failing to hold that his detention is wrongful. Rather, this case addresses the first duty imposed by the Hostage Act: the President's duty to inquire into the reasons for his detention, in order to make a determination of whether Plaintiff has been wrongfully detained. *See* 22 U.S.C. § 1732 (requiring the President to "demand of the [foreign] government the reasons of [an American's] imprisonment" and then to seek that individual's release if his detention "appears to be wrongful and in violation of the rights of American citizenship."); Compl. ¶¶ 84, 91 & Prayer for Relief.

Other courts make clear the limits of the *Abu Ali* case. For example, in *Flynn v. Shultz*, the Seventh Circuit addressed the Hostage Act in a case in which an American detained in Mexico primarily sought "an order in the nature of mandamus or injunction to 'compel the defendant to authorize [a consular official] to present testimony to the Supreme Court of Mexico on behalf of [the detainee],'" but also asserted that "certain actions" were mandated by the Hostage Act. 748 F.2d 1186, 1189 (7th Cir. 1984) (quoting the brief). After extensive analysis of the statute and its legislative history, the Seventh Circuit concluded that "the Hostage Act requires the Executive to undertake a meaningful inquiry into the circumstances of the detention" of any United States citizen imprisoned abroad, "in order to determine whether the citizen is unjustly deprived of liberty." 748 F.2d at 1196. Likewise, in *Redpath v. Kissinger*, a district court described "the rights . . . accruing under [the Hostage Act]" to include a detainee's right "to have his case examined into

and a report made thereof." 415 F.Supp. 566, 568 (W.D.Tex. 1976), affirmed, 545 F.2d 167 (5th Cir. 1976).[6]

In sum, even if the Hostage Act does not provide for judicial review of the Executive Branch's determination as to whether a particular individual is "unjustly" or "wrongful[ly]" detained, 22 U.S.C. § 1732, or what actions are appropriate to effectuate the citizen's release, courts are empowered to enforce the duty of inquiry that the Hostage Act imposes on the President, and to review "the extent of the inquiry" to assess whether the President has, in fact, "undertake[n] a meaningful inquiry into the circumstances of the detention." *Flynn*, 748 F.2d at 1195–96. That is all Plaintiff asks for here, and his claims are proper.

**D. Plaintiff Does Not Seek Review of Any Discretionary Agency Action.**

As the preceding sections make clear, although the Executive Branch certainly has broad discretion in how it executes hostage negotiations and other aspects of foreign policy, Congress did not give the State Department discretion to simply ignore the dozens of Americans who are victims of wrongful detention by a foreign government or non-state actor. To the contrary: in the clear, mandatory terms of the Hostage Act and Levinson Act set forth above, Congress prescribed a series of actions to be taken in the case of *every* American detained abroad, to determine whether that detention is wrongful, attempt to bring the individual home if so, and report to Congress along the way. The Government, though, reads these two statutes to only "provide general guidance to the Executive Branch." Defs Br. at 3, 5, 21. Thus, the Government claims it has "never understood the [Levinson Act] to require [wrongful detention] determinations with respect to particular

[6] Although the D.C. Circuit has not fully analyzed the meaning of the Hostage Act, it has described it as a "congressional mandate," and as "assistance Congress requires the President to afford an American citizen in trouble abroad." *Worthy v. Herter*, 270 F.2d 905, 910 & n.2 (D.C. Cir. 1959) (citing the President's duties under the Hostage Act as good reason why the President should have the power to prevent travel to certain places where an American is likely to get into trouble).

individuals detained overseas"—an admission that it has been ignoring the Levinson Act all this time, not only with regard to Plaintiff but also with regard to "thousands" of others. Defs Br. at 22. Indeed, some four years after Congress enacted the Levinson Act and its mandates, the Government complains that "[t]his lawsuit . . . would require the Secretary of State, in each of the thousands of cases" of Americans detained abroad, "to weigh in on whether those detentions are 'wrongful,'" Defs Br. at 1, 23—but it was Congress, and not this lawsuit, that imposed that requirement, and the Executive Branch is not, in our system of government, able to simply ignore that statutory command. Nor does the Government's repeated remark that there are "thousands" of Americans detained abroad justify this alarming disrespect for the law, even as it grossly exaggerates the number of individuals who are detained under circumstances suggesting wrongful detention, such as those currently detained in Russia—a current total estimated to be only nine individuals.[7]

Though the Government repeatedly says otherwise,[8] Plaintiff is plainly not seeking review of any "agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Rather, Plaintiff only seeks an order requiring agency action that the agency officials do not have

---

[7] *See* Katrina vanden Heuvel and James W. Carden, *Opinion: Sanctions Relief for hostages? It could save nine American* lives, Washington Post (Aug. 23, 2024), https://www.washingtonpost.com/opinions/2024/08/23/russia-hostages-sanctions-relief/ (stating that, after three Americans were released by Russia during the multinational prisoner exchange on August 1, 2024, there remain nine Americans detained in Russia). The Government's claim that it would be too difficult for Defendants to comply with the Levinson Act and make the wrongful detention determinations it requires because "thousands" of Americans are detained abroad is belied by its admission that "[m]ost cases of U.S. nationals arrested or detained overseas arise out of legitimate law enforcement and judicial processes," which makes a determination in those cases uncomplicated. Defs Br. at 4, 24–25. Indeed, the internal contradiction in the Government's position is obvious in light of its admission that the State Department already has the resources to provide extensive support to each of these thousands of individuals. *Id.*

[8] *See, e.g.*, Defs Br. at 1 ("This lawsuit attempts to upend the wise allocation of decision-making authority regarding wrongful detention determinations to the political branches. . .").

discretion to refuse to perform. Such relief is specifically within the scope of the APA which authorizes this Court to "compel the Secretary to make decisions" as required by statute, especially where Plaintiff does not seek review of the "contents of the . . . decisions" or ask the Court to dictate "the means the Secretary uses to ensure [the actions are completed] in a timely fashion." *Am. Hosp. Ass'n*, 812 F.3d at 191; *see, e.g.*, *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 420 (D.C. Cir. 2004) (ordering the agency to act because petitioners were "entitled to an end to [the agency's] marathon round of administrative keep-away"); *In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 836-38 (D.C. Cir. 2012) (addressing claims of unreasonable delay in government decisionmaking and related mandamus claims, even in the highly sensitive national security area).

The Court should reject this familiar attempt by the Government to shield agency action—or in this case, egregious inaction—from judicial review. The Government almost exclusively relies on *Heckler v. Chaney*, 470 U.S. 821 (1985), in its effort to argue, incorrectly, that Plaintiff's Complaint improperly seeks review of "agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Defs Br. at 3, 11, 15–26. But *Heckler* is inapplicable: there, the plaintiffs sought to force an agency to actually prosecute certain enforcement actions; specifically, the plaintiffs there "requested the FDA to take various investigatory and enforcement actions to prevent . . . perceived violations; they requested the FDA to affix warnings to the labels of all the drugs stating that they were unapproved and unsafe for human execution, to send statements to the drug manufacturers and prison administrators stating that the drugs should not be so used, and to adopt procedures for seizing the drugs from state prisons and to recommend the prosecution of all those in the chain of distribution who knowingly distribute or purchase the drugs with intent to use them for human execution." 470 U.S. at 824. Plaintiff does not seek anything remotely like this

kind of relief, but only that Defendants review his case and make the determination that the Hostage Act and Levinson Acts require, as well as any other mandatory steps that those statutes require as a result.

Defendants also express concern that Plaintiff asks the Court to involve itself in foreign policy matters reserved for the political branches. Defs Br. at 17–18. But that concern is unfounded: Plaintiff is not seeking to dictate foreign policy with Russia.[9] Plaintiff understands that our U.S. "Constitution primarily delegates the foreign affairs powers to the political departments of the government, Executive and Legislative, not to the Judiciary," that the "highly political" decisionmaking in this area is "delicate and complex," and "often rests upon information . . . not readily available to the courts," and that "the creation of wise foreign policy typically lies well beyond the experience or professional capacity of a judge." *Zivotofsky v. Clinton*, 566 U.S. 189, 213–14 (2012) (quotation marks omitted). But none of these well-worn precepts excuses the judiciary from fulfilling its obligation to enforce Congress's statutory commands. Indeed, that would be a serious affront to our Constitutional structure.

After all, "the Constitution also grants Congress powers related to foreign affairs, such as the powers to declare war, to regulate foreign commerce, and to regulate naturalization." *Id*. at 214 (citing U.S. Const. art. I, § 8). And when Congress exercises these powers and passes a law in the area of foreign policy, "the Constitution requires the President (through the Secretary of

[9] Plaintiff does not, for example, ask the Court to compel the State Department to change its sanctions policy against Russia in order to save his life, as two Washington Post journalists have recently advocated. *See* Katrina vanden Heuvel and James W. Carden, *Opinion: Sanctions Relief for hostages? It could save nine American lives*, Washington Post (Aug. 23, 2024), https://www.washingtonpost.com/opinions/2024/08/23/russia-hostages-sanctions-relief/ (proposing that the Biden administration agree to relax sanctions against certain Russian nationals in order to obtain the release of Plaintiff and eight others still detained in Russia).

State) to execute that statute." *Id*. (citing U.S. Const. art. II, § 3 ("Take Care Clause") (requiring the President to "take Care that the Laws be faithfully executed")). This fundamental constitutional duty of the President and executive agencies to execute the laws passed by Congress "does not permit the President to refrain from executing laws duly enacted by the Congress," nor does it give the Executive the power to interpret what those laws require of them—the "laws are construed by the judiciary." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 604 (D.C. Cir. 1974). The Supreme Court has long rejected the notion that "the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution," because giving the President the power to refuse to carry out the laws would "cloth[e] the President with a power entirely to control the legislation of congress, and paralyze the administration of justice." *Kendall v. United States*, 37 U.S. 524, 613 (1838); *see also United States v. Texas*, 599 U.S. 670, 731 (2023) (Alito, J., dissenting) (discussing *Kendall* and related cases). That, however, is the power that the Government claims here. Its arguments should be rejected.

## II. PLAINTIFF HAS STANDING TO BRING HIS CLAIMS.

This Court's subject matter jurisdiction extends only to cases or controversies. U.S. Const. art. III §1. Thus, a plaintiff must allege facts sufficient to show that he has standing to sue, which requires showing that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish the first element, injury in fact, "a plaintiff must show that he or she suffered an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent." *Id*. at 339 (quotation marks omitted). Because Defendants misconceive the injury that gives Plaintiff standing to bring this case, their standing arguments (asserting that Plaintiff fails to sufficiently allege the second and third of these three elements) miss the point. Defs Br. at 2, 11–14.

The primary injury that affords Plaintiff standing to sue here is not the mental and physical harm caused by Russian prison authorities—horribly severe though that is—but the deprivation of a determination as to whether or not he is wrongfully detained. Although, as the Government notes, this is the first lawsuit addressing the Levinson Act, analogous decisions in this circuit establish that this precisely the kind of injury that gives rise to standing under Article III. For example, in *Babaei v. United States Dep't of State*, the court rejected arguments similar to those raised by the Government here and held that, "[a]s other judges in this District have consistently held," plaintiffs sufficiently alleged an injury in fact "in the form of a failure to receive final decisions on their applications within a reasonable period," and that their "injuries—unreasonable delay—would be redressed by a decision, one way or the other." Civil Action No. 23-1244 (TJK), 2024 U.S. Dist. LEXIS 47952, at *9 (D.D.C. Mar. 19, 2024). Likewise, in *Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Kerry*, the court found that although the plaintiffs alleged other injuries, including "serious, imminent threats to their life and well-being," their "primary injury" for purposes of standing was "the failure to receive final decisions on their [Special Immigrant Visa] applications within a reasonable period." 168 F. Supp. 3d 268, 281 (D.D.C. 2016). The same principles apply here.

When, as in this case, the injury is the deprivation of a Government decision, the traceability and redressability elements of standing are straightforward: as the court in *Nine Iraqi Allies* held, plaintiffs' injury, "Defendants' failure to adjudicate the applications," was "quite clearly caused by Defendants' conduct" and was redressable by a court order granting relief under the Mandamus Act and the APA. *Id.* at 282. Plaintiff satisfies all three elements of standing for the same reasons: A court order granting the relief he requests, and compelling Defendants to perform actions unreasonably delayed, will redress his injuries. Just as Plaintiff does in this case,

plaintiffs in *Nine Iraqi Allies* "ask[ed] the Court to do just what the APA and the Mandamus Act authorize: issue an order to adjudicate their applications, whatever the substantive results may be. Such an order would directly redress Plaintiffs' injury caused by the Government's failure to decide." *Id.*; *see also Afghan & Iraqi Allies v. Pompeo*, Civil Action No. 18-cv-01388 (TSC), 2019 U.S. Dist. LEXIS 14465, at *25 (D.D.C. Jan. 30, 2019) ("Plaintiffs seek final adjudication of their applications; not a specific outcome. If Plaintiffs are granted a visa, their injury will be redressed. If Plaintiffs are finally denied at any of the intermediary steps, although it is not their desired outcome, their injury—the lack of adjudication—also will be redressed."); *Marwah Al Ihsan Al-Gharawy v. U.S. Dep't of Homeland Sec.*, 617 F. Supp. 3d 1, 9 (D.D.C. 2022) (finding that the "particularized injury about which Plaintiffs complain is a delay in adjudicating their visa petitions" and that this was sufficient to confer standing).

In sum, the Government's arguments regarding standing fail to recognize Plaintiff's primary injury—which is the deprivation of a determination as to whether or not he is wrongfully detained—and instead only relate to secondary injuries that flow ("speculatively," the Defendants say) from this deprivation of agency action. Defs Br. at 12–14. But once the primary injury is considered, Defendants' concerns that the Court would be left to speculate as to the actions of foreign sovereigns or other third parties lack merit. It is Defendants, and not any Russian authorities, who have the power to take the actions under the Levinson Act and Hostage Act that Plaintiff show must be taken, and a Court order telling them to do so would clearly redress Plaintiff's injury.

As for which particular Defendants are properly sued here, Plaintiff has "standing to proceed against each defendant . . . to the extent that an order from this Court compelling that defendant to act . . . would redress" his injury. *Al-Gharawy*, 617 F. Supp. 3d at 9 (quoting

*Abulhawa v. U.S. Dep't of the Treasury*, 239 F. Supp. 3d 24, 36 (D.D.C. 2017)). Although the ability of other Defendants to redress Plaintiff's injuries may be in doubt, the President and the Secretary of State certainly have power to order others to take action on Plaintiff's case in a manner that would redress his injury, so they are undoubtedly proper Defendants. Indeed, the Hostage Act imposes duties directly and *only* on the "President," 22 U.S.C. § 1732, rather than the head of the executive department responsible for this field (the Secretary of State), so the President is a proper defendant in this lawsuit regardless of how rare that may be in the usual cases challenging administrative action. *See* Defs Br. at 27–28.

Although it is possible that, after discovery, the Court may ultimately determine that Plaintiff lacks standing to pursue his claims against certain of the Defendants—if, for example, discovery reveals that those named Defendants do not, in fact, have the authority or ability to perform the mandatory duties set forth in the Levinson Act and Hostage Act or have completed their part in that process, and cannot at this point "exert authority over the timing of that process," such that an order compelling these individuals to act would not redress his injury, Plaintiff has alleged standing as to each Defendant because the Court "could order [him or her] to take some action, at present, that would remedy the delay" Plaintiff currently challenges. *Al-Gharawy*, 617 F. Supp. 3d at 9–10. That is because the Complaint alleges that each named Defendant has a role in either the "review" or "determination" required under the Levinson Act, or the inquiry, determination, and report required under the Hostage Act, or else has authority over others responsible for these actions. *See* Compl. ¶¶ 2, 7–14, 25; *Al-Gharawy*, 617 F. Supp. 3d at 10; *see also Khazaei v. Blinken*, Civil Action No. 23-1419 (JEB), 2023 U.S. Dist. LEXIS 164822, at *10 (D.D.C. Sep. 18, 2023) (finding standing to sue the Secretary of State notwithstanding the fact that he "has no legal authority to control which visa applications consular officers grant or deny,"

because "nothing precludes him from directing them to decide pending applications 'within a reasonable time,' as the APA requires.")

## III. PLAINTIFF'S CLAIMS FOR MANDAMUS AND DECLARATORY RELIEF ARE PROPER AND SHOULD NOT BE PREMATURELY DISMISSED.

It is, of course, permissible for a complaint to plead alternative forms of relief. Indeed, Federal Rule of Civil Procedure 8 specifically states that a complaint must contain "a demand for the relief sought, which may include relief in the alternative or different types of relief." Thus, although the Court may ultimately determine that relief under the APA is sufficient to remedy Plaintiff's injuries, it should not therefore dismiss Plaintiff's alternative claims for relief under the Mandamus Act (Count III) or the Declaratory Judgment Act (Count IV); to do so at the pleadings stage would be terribly premature.

With regard to Plaintiff's Mandamus Act claim, the Government argues that it should be dismissed because the APA provides him with an adequate alternative remedy, even as it contends that relief under the APA is unavailable to Plaintiff. Defs Br. at 28–29. Not surprisingly, the only case the Government cites here does not support its argument.[10] Of course, Plaintiff does not dispute that the Court can only grant mandamus relief if "there is no other adequate remedy available to plaintiff." *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020). But until the Court

---

[10] In that case, *Upton v. Birotte*, the plaintiff's bizarre request was for a "writ of mandamus under 28 U.S.C. § 1361 to compel the United States Attorney for the Central District of California to present evidence of criminal activity to a federal grand jury"—the alleged criminal actors being several federal judges, and their alleged criminal activity being the act of dismissing his lawsuits. Civil Action No. 11 1332, 2011 U.S. Dist. LEXIS 79137, at *1-2 (D.D.C. July 20, 2011). Of course (and even setting aside judicial immunity and that decisions to prosecute are discretionary) the appropriate way to seek review of a dismissed federal lawsuit is through the appeals process, not by attempting to force criminal charges against the judge, so the court in *Upton* found that the plaintiff could not satisfy this third element of a mandamus claim because the "federal appeals process provides an adequate remedy for petitioner to challenge the adverse rulings of the lower courts." *Id*. at 2. That logic does not extend to the entirely different legal claims brought here, which are appropriate mandamus and APA claims.

decides the merits of Plaintiff's APA claims, it cannot definitively say that it lacks jurisdiction over his Mandamus Act claim because the APA claims are "available" to him. While Plaintiff believes the Court ultimately will decide this case in his favor on the merits of his APA claims, it would be premature to dismiss the alternative Mandamus Act claim on the grounds that it is superfluous—the Court must first decide whether or not relief under the APA is available to Plaintiff; only if it is not can the Court then dismiss the Mandamus Act claims based upon the "other adequate remedy" the APA provides. *Id.*

Defendant does not assert that there are any other adequate remedies available to Plaintiff, such as an administrative process, that he should exhaust before seeking mandamus. But it is worth emphasizing that Plaintiff has only brought his Mandamus Act claim to this Court as an absolute last resort. As alleged in the Complaint, "Plaintiff and his advocates have frequently communicated with State Department employees at all levels, to no avail." Compl. ¶ 87; *see also* ¶¶ 4, 32, 63, 66. Since he was first detained in 2016, Plaintiff and his family have pleaded with Defendants relentlessly, including through email correspondence with them and with numerous others employed by the State Department, to take action on his case and make a wrongful detention determination. And while they have frequently replied, they have never taken the action he requests. For all of these reasons, the allegations in the Complaint are more than sufficient to state a claim for Mandamus Act relief as an alternative to relief under the APA.

With regard to the Declaratory Judgment Act claim, the Government argues that this claim should be dismissed entirely because this Act "does not give rise to a cause of action or create an independent source of federal jurisdiction." Defs Br. at 29. It is, of course, true that the Declaratory Judgment Act only extends the types of relief available in federal court and "does not extend the jurisdiction of the federal courts." *Medtronic, Inc. v. Mirowski Family Ventures*, LLC,

571 U.S. 191, 197 (2014). For this reason, courts should dismiss a claim under the Declaratory Judgment Act if it is a freestanding claim or if a court finds that it lacks subject matter jurisdiction over the other claims raised. *See Schilling v. Rogers*, 363 U.S. 666, 677 (1960) ("[T]he Declaratory Judgment Act is not an independent source of federal jurisdiction; the availability of such relief presupposes the existence of a judicially remediable right." (citation omitted)); *Ali v. Rumsfeld*, 649 F.3d 762, 778 (2011) (affirming dismissal of Declaratory Judgment Act claim where plaintiffs had not otherwise "alleged a cognizable cause of action" to sue in federal court).

Here, by contrast, Plaintiff has not sought access to federal court by relying on the Declaratory Judgment Act as the basis for jurisdiction; he has alleged other claims over which this court has subject matter jurisdiction and his ancillary claim for declaratory relief is properly brought as an alternative claim for relief. Compl. ¶¶ 15–16; *see* Fed. R. Civ. P. 8. That is, if the Court agrees that it has subject matter jurisdiction over Plaintiff's other claims, it will have discretion as to "whether and when" to grant relief under the Declaratory Judgment Act. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995) ("[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites.") And, as with the Mandamus Act claim, the Court may ultimately conclude on the merits that declaratory relief under the Declaratory Judgment Act is unnecessary, since the APA affords Plaintiff adequate relief. However, the Court should not dismiss this claim for that reason at the pleadings stage before the record has been developed and the Court has had an opportunity to consider the merits of Plaintiff's other claims. As another court in this District recently concluded, "[u]ltimately, relief under the Declaratory Judgment Act may be unnecessary, and the Court, in its discretion, may dismiss this claim. However, at the motion to dismiss stage, the Court is not prepared to say that [this] claim is

duplicative . . . or otherwise unnecessary or inappropriate." *Morinville v. United States PTO*, 442 F. Supp. 3d 286, 296 (D.D.C. 2020). The same is true here as to both the Mandamus Act and Declaratory Judgment Act claims, and they should not be dismissed at this early stage.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss should be denied.

Dated: September 9, 2024

Respectfully submitted,

By: */s/ Lawrence S. Lustberg*
Lawrence S. Lustberg
Ruth O'Herron
Gibbons Fellowship in Public Interest &
Constitutional Law
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102
(973) 596-4500
llustberg@gibbonslaw.com
roherron@gibbonslaw.com
*Attorneys for Plaintiff*